**EATON CORPORATION, Plaintiff,**

v.

**APPLIANCE VALVES COMPANY; Thomas Krzewina, an individual; William R. Donahue, Jr., an individual; David F. Miller; Design and Manufacturing Corp., Defendants.**

**No. L 81–42.**

United States District Court, N.D. Indiana, Hammond Division, at Lafayette.

May 3, 1984.

---

Christopher B. Fagan, Cleveland, Ohio, John F. Bodle, James V. McGlone, Lafayette, Ind., for plaintiff.

David M. Mattingly, James H. Dobson, Indianapolis, Ind., Edward N. Kalamaros, South Bend, Ind., Joseph T. Bumbleburg, Ball Eggleston Bumbleburg & McBride, Lafayette, Ind., Peter D. Shaw, Connersville, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

This action is premised upon counts of alleged misappropriation of trade secrets and confidential information, alleged breach of contract not to disclose trade secrets and confidential information, alleged breach of fiduciary duty, alleged conspiracy to misappropriate trade secrets and confidential information, alleged interference with contractual relations, alleged patent infringement and alleged unfair competition. Jurisdiction of this court is predicated upon diversity of citizenship, 28 U.S.C. § 1332(a)(1) and original jurisdiction with respect to patent claims, 28 U.S.C. § 1338. The law of the forum, Indiana, is determinative of the substantive non-patent issues raised in this matter. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This case was tried on liability issues before the court sitting without a jury on October 22, 23 and 24, 1984. Because of the complexity of this case, this court chose not to adhere strictly to the Seventh Circuit Judicial Council Resolution of October 4, 1984 requiring the submission of post-trial briefs within ten (10) days of the bench trial. The excellent post-trial briefs in this action were submitted and exchanged on March 21 and 22, 1985. Final oral argument in this matter was held April 22, 1985 in Lafayette, Indiana. This memorandum and order constitutes this court's findings of fact and conclusions of law for purposes of Fed.R.Civ.P. 52(c).

## I.

The original complaint filed by plaintiff, Eaton Corporation (Eaton), against defendants, Appliance Valve Corporation (AVC), Thomas Krzewina (Krzewina), and William R. Donahue (Donahue), asserted three causes of action: misappropriation of trade secrets, breach of contract not to disclose trade secrets and conspiracy to misappropriate trade secrets. The complaint also contained a request for injunctive relief.

After this lawsuit was filed and before trial on the preliminary injunction, Eaton filed its application for patent 4,387,878 (878 patent) dated July 13, 1981. Eaton's development of the patent in the patent office occurred during the time period as it was proceeding with this suit.

The preliminary injunction claim was tried on September 24, 1981. This court entered its Findings of Fact and Conclusions of Law on November 25, 1981, *see Eaton Corporation v. Appliance Valves Corporation*, 526 F.Supp. 1172 (N.D.Ind. 1981) denying Eaton's request for injunctive relief. Eaton appealed this order to the United States Court of Appeals for the Seventh Circuit. The Seventh Circuit affirmed this court's order on July 22, 1982 by unpublished order, 688 F.2d 842.

After filing a motion for leave on October 12, 1982 and being granted leave on February 1, 1983, Eaton filed its Amended Complaint on February 28, 1983. In this complaint Eaton makes claim against David Miller (Miller) and Design and Manufacturing Corporation (D & M). The Amended Complaint realleges misappropriation of trade secrets (although it adds confidential information to trade secrets) and breach of contract not to disclose trade secrets as against AVC, Krzewina and Donahue. Eaton's third cause of action against AVC, Krzewina and Donahue is breach of fiduciary duty of loyalty and fidelity. Miller and D & M are added to Eaton's allegation of conspiracy to misappropriate trade secrets. Finally, Eaton alleges unfair competition against all defendants, interference with contracts against Miller and D & M and conspiracy to breach fiduciary duty of loyalty and fidelity against all defendants.

D & M and Miller's answers to the Amended Complaint includes the statute of limitations defense. Eaton agrees that the non-patent allegations against D & M and Miller in the Amended Complaint sound in tort.

On June 14, 1983 Patent 878 was issued. Following Eaton's notice of infringement, AVC immediately modified its produce so that there would be no question of alleged infringement. However, Eaton sought leave for its Second Amended Complaint on June 29, 1983, and filed its Second Amended Complaint on August 17, 1983 adding an additional cause of action alleging patent infringement against AVC and D & M.

Eaton is an Ohio corporation with over 1,800 employees in its control assemblies division. In 1963 Eaton became involved in the valve business when it acquired Dole Valve Company. That company manufactured water inlet valves for manufacturers of dishwashers, clothes washers and automatic ice makers. Eaton continued the Dole business and, at the time of the suit, dominated the original equipment market in water inlet valves for dishwashers, supplying all the major manufacturers—General Electric, Whirlpool, Westinghouse, Design and Manufacturing and others—in the United States. Singer, another manufacturer of water inlet valves, had in the past supplied some dishwasher valves for original equipment, but today sells such valves only in the after-market for replacement purposes, and also sells valves in the original equipment market for clothes washers and ice makers. Horton, the only other manufacturer of water inlet valves for dishwashers, sells exclusively in the after-market for replacement purposes. Currently AVC is the only original equipment manufacturer of water inlet valves for dishwashers, other than Eaton.

Donahue graduated from Geneva High School in Illinois and holds bachelors and masters degrees from the University of Illinois. Both degrees are in mechanical engineering. He worked during summers,

while attending the university, doing consulting work for Helstro Corporation. One summer was spent consulting for a company designing a dishwasher. Prior to being employed by Dole Valve Company (then a part of Eaton) in October 1964, Donahue worked for Rough Rider Corporation which produced equipment for the printing industry. Donahue resigned from Eaton in September 1977 and returned to Eaton in September 1979. In the two years away from Eaton he organized Donahue Manufacturing and Engineering Company. That Company developed automatic assembly equipment and a bolt drilling machine, and consulted on other equipment. While with Donahue Manufacturing he developed an in-line water filter, and he designed a single solenoid ice maker valve and initiated preliminary design of a water inlet valve. Donahue returned to Eaton because his company was not producing enough income to support his family. In his first employment at Eaton, he was Product Engineering Manager for Water Valves and on his return was Chief Engineer for Appliances. He resigned his position at Eaton a second time in November 1980.

Krzewina is a graduate of Technical High School in Milwaukee and attended night engineering courses at Marquette and Wisconsin Universities for twelve years. Prior to employment by Eaton in May 1969, Krzewina was employed by Harnischfeger Corporation as a designer/draftsman for traveling and overhead cranes, at Allstate Design and Development Corporation, as a design draftsman for various products, and at Hotpoint Corporation, where he worked on the design and development of dishwashers, disposals and water heaters. While at Hotpoint he was the inventor of four U.S. patents—one for a coupling and vent valves for dishwashers, one for an additive dispenser for dishwashers, and two for rack designs for dishwashers. Krzewina was employed by Eaton at its Control Division located at Carol Stream, Illinois in May 1969 as Sales Engineer. In this capacity with Eaton, he called on the major appliance manufacturers: Frigidaire, Westinghouse, Hobart, D

& M, Waste King, and Whirlpool. On October 1, 1979, he became Product Manager for appliance inlet valves. He resigned from Eaton in November 1980.

AVC is an Indiana corporation organized by Donahue and Krzewina, after leaving the employment of Eaton, for the purpose of manufacturing water inlet valves. It operates in a building Lafayette, Indiana, leased from D & M, a large manufacturer of dishwashers sold under various private labels. From 1958 to September 15, 1981, Miller was Director of Purchasing for D & M until his retirement in 1981.

While employed at Eaton, Donahue and Krzewina manifested an interest in owning and managing their own business. They discussed their need for financing with two independent businessmen in Indianapolis in November 1979. Also present at this meeting was Pat Palmer, Krzewina's Supervisor at Eaton. This meeting ended with no interest being shown in the venture.

Subsequent to the Indianapolis meeting, Sam Regenstrief of D & M expressed a desire to talk with Krzewina and Donahue. Donahue submitted a cost estimate by himself based upon his general knowledge of the industry, and more specifically, from his cost calculations prepared while with Donahue Manufacturing. Miller evaluated this estimate and did a cost check by requesting quotes from a coil supplier and from an injection molder concerning the major parts of the valve which he was purchasing from Eaton. To request those quotes, Miller obtained parts from D & M inventory and the drawing of the body and guide tube from D & M's engineering files. These drawings were not preserved when they were returned.

The meeting with D & M representatives occurred in Florida, and the expenses of Krzewina's and Donahue's trip were purportedly paid for by D & M, at least the expenses for a one-day trip from Cincinnati to Florida and back to Cincinnati. Krzewina, however, requested and received reimbursement from Eaton for air transportation from Chicago to Cincinnati, and hotel

and meal expenses in Cincinnati immediately prior to the flight to Florida for the meeting with D & M officials. It was at this meeting that Donahue and Krzewina discovered that D & M would be interested in purchasing valves that they might produce.

After the Florida meeting, Krzewina and Donahue did view two sites that might be available as a business facility. Again, Eaton paid, in part, Krzewin's expenses incurred on one of these trips to view what later became the AVC facility in West Lafayette. The men also discussed the basic concepts of the water inlet valves with a patent attorney to obtain assurance that the well-accepted principles of valve design known to the industry were not protected by patents.

In November of 1980, attorneys for Krzewina and Donahue reported that it might be possible for Krzewina and Donahue to start a business. Krzewina and Donahue terminated their employment with Eaton on November 26, 1980.

Upon being hired by Eaton, Krzewina and Donahue executed employee agreements in which they agreed not to disclose or use Eaton trade secrets or confidential information subsequent to their employment. Paragraph 4 of the employee agreement provides that unless the written consent of Eaton is first obtained, Krzewina or Donahue shall not disclose or use at any time either during or subsequent to his employment, any secret or confidential information of Eaton which was acquired during said employment, whether or not developed by him. Eaton has given no consent, either written or oral, to Krzewina or Donahue to disclose or use secret or confidential information of Eaton acquired during his employment. The agreement further provides that Krzewina or Donahue were to give Eaton any and all developments and assign all patents to Eaton. Krzewina executed an employee agreement on April 1969. Donahue executed employee agreements on February 15, 1975 and on August 1, 1979.

Donahue and Krzewina made no agreement with Eaton that they would not seek other employment or pursue other opportunities while with Eaton, or that they would give notice to Eaton prior to leaving, or that they would not compete with Eaton after leaving it.

The trade secrets and confidential information claimed by Eaton relate to water inlet valves in dishwashers. Eaton maintained no list of trade secrets and confidential information and supplied none to its employees. Even Eaton's chief executive officer has no knowledge of how an employee of Eaton determines what is confidential or secret, and he has no recollection of ever being provided with a company policy concerning what is considered confidential and secret at Eaton. Eaton produced no such policy at trial.

After leaving Eaton, Donahue began preparing drawings for a valve that would ultimately be modified in many respects. On December 1, 1980, Krzewina and Donahue reached an agreement with D & M, and AVC was formed on December 2, 1980. Spring of 1981 was spent by Donahue and Krzewina in working out problems with the valve and putting together a valve that worked and could be assembled by a small group of employees. Eaton filed this lawsuit on AVC's first day of production. At issue here are water inlet valves. These valves automatically supply water when needed for the functioning of dishwashers, clothes washers and automatic ice makers. They are activated by a time or other mechanism that causes an electrical current to operate a solenoid cell which opens and closes the valve in order to supply the needed water. Basically these valves all contain the same component parts. A valve known as the Horton valve, which is sold in the after-market, is a Chinese copy of the Eaton valve. A valve known as the Singer valve is similar to the Eaton valve and is also sold in the after-market. The AVC valve which is being produced for D & M has parts similar to those not only in the Eaton valve, but also in the Singer and Horton valves. The parts in the AVC valve, however, are sufficiently

different from those in the Eaton valve, and they are not interchangeable with those in the Eaton valve.

Raymond McCarty, the Production Manager of Eaton, described what he termed "deficiencies" in the AVC valve as compared to the Eaton valve. Properly, these deficiencies may be termed "differences". These differences include the flow washer, suppressor plate, body, gasket, screen, diaphragm, spring, coil, coil terminals, armature, guide tube and C frame. The AVC valve does not incorporate any features of the Eaton valve which may properly be claimed as trade secrets of Eaton or confidential information. All of the features of the Eaton valve are either on file in the U.S. Patent Office and disclosed as patents, expired or unexpired, or in patent applications, or they can be discovered by any knowledgeable person reasonably skilled in the industry from an examination of any one of the millions of Eaton valves available in the market or from customers of Eaton, or from an examination of the similar Horton or Singer valves. Donahue and Krzewina used their general skill and knowledge as engineers to design independently, through trial and error, the valve manufactured by AVC. They did not use any design which can properly be characterized as a trade secret or as confidential information of Eaton.

The drawings from which the AVC valve was produced were drawn by the defendant Donahue after he left the employment of Eaton. When Donahue and Krzewina left Eaton's employment no drawings for the design of the AVC valve were in existence. The dimensions were established either from memory or from Singer and Eaton valves which had been obtained from D & M. Donahue did not design the AVC valve, by using any memory of Eaton's tolerances and/or clearances. Krzewina and Donahue never contacted an Eaton supplier in regard to dimensions or tolerances. Donahue's use of a diaphragm and inner cut was a concept generally known and available in the industry in 1980. After Krzewina and Donahue left Eaton, quotations were sought by AVC or by D & M on behalf of

AVC on the basis of the drawings Donahue prepared after leaving Eaton. The materials selected by AVC are materials readily available in the market place, and all of the materials used in the production of the valve or AVC are materials available generally from suppliers in the market and are commonly known as shelf items.

The patent infringement charge is based upon the Zukausky patent which relates generally to a pilot-operated valve. Keith Zukausky, the inventor listed on the 878 patent, testified that he began considering this invention in November of 1980, with testing being performed during the first six months of 1981. On July 13, 1981, Eaton filed patent number 878 with twenty-nine (29) claims based upon "attachment." On January 18, 1983, these claims were rejected, and five new claims asserting sealing were added. Patent 878 was issued on June 14, 1983 as to these five claims based upon sealing.

Many of the components and operative features of the valve disclosed and claimed in the Zukausky patent are common in such valves in existence prior to 1980. In general a pilot-operated valve utilizes a diaphragm which is moveable between two different positions. In one position, the diaphragm "seats" upon a valve "port" and the valve is closed to the flow of water. In the other position, the diaphragm is displaced from the port and water is permitted to flow through the valve. The valve port may be conveniently likened to the end of a tube which extends into a cavity connected with the water supply. When the end of the tube is covered, the water cannot flow into and through the tube; when the end is uncovered, the water can flow freely.

These valves have typically used a circular diaphragm which is secured about its periphery to the surrounding valve body. The valve port is also circular, and smaller than the diaphragm diameter, and is aligned with the center of the diaphragm. A ring-shaped, or annular, area of the diaphragm surrounds the valve port. This annular area is exposed to the water sup-

ply inlet, with the central valve port representing the water outlet. When the diaphragm is seated against the port, the water supply is prevented from passing from the annular inlet area to the central water outlet. However, when the diaphragm is moved away from the port, the water flows freely from the annular inlet, around the edge defining the valve port, and through the water outlet to the clothes washer or other appliance. Many of these valves include a diaphragm insert which to most such valves is a pilot outlet hole which extends through the diaphragm and insert in the center of the diaphragm. This aperture is either opened or closed by an external solenoid valve. A pilot inlet hole is also provided to permit high pressure water from the water supply to enter behind the diaphragm, on the side opposite the valve port.

The location of the pilot inlet aperture is different for various valves. In many of the valve designs prior to 1980, the pilot inlet aperture extended through the diaphragm insert and the diaphragm. A second type of prior valve design shows a valve having the pilot inlet hole located only in the diaphragm, and the annular area outside the diaphragm insert.

Defendants rely on certain additional items asserted to constitute prior art to the Zukausky patent. The dates of these items must be compared to the operative dates under 35 U.S.C. § 102(a) and (b) for the invention claimed in the Zukausky patent. Zukausky conceived of the subject matter claimed in the Zukausky patent in about November 1980 and the application was filed on July 13, 1981. Under the operative facts, each of the Ostrowski patent, Singer valve and Swanson valve, upon which defendants rely, qualifies as prior art to the Zukausky invention.

The first item of art is the Ostrowski patent which issued January 8, 1974. Ostrowski discloses as a preferred embodiment a pilot-operated valve having a diaphragm and an insert, with the pilot inlet hole extending through both the insert and the diaphragm. The Ostrowski patent describes a valve in which the insert is molded into the diaphragm, although it also indicates that the insert could be designed to snap into the diaphragm. The Singer valve cited by the defendants has been in production since about 1972. The Singer valve is substantially the same as the preferred embodiment disclosed in the Ostrowski patent. The third item of art relied upon by defendants is certain work performed by Wes Swanson while an employee of Eaton. Wes Swanson designed his pilot-operated valve in about 1975–1976. The Swanson valve was designed to avoid chatter by preventing bypass flow of water between the diaphragm and the insert, and for this purpose had the diaphragm pinned to the insert to prevent such bypass flow. The pertinent dates for this art and the Zukausky invention show that each of the Ostrowski patent, Singer valve and Swanson valve constitute prior art to the claimed Zukausky invention.

Although defendants failed to give specific notice to Eaton of the Ostrowski, Singer and Swanson prior art, Eaton was given a copy of the Ostrowski patent as a deposition exhibit in this case. Eaton knew or should have known of the Singer valve since this valve was one of the few competitive valves on the market, and has been marketed for over ten years. Moreover, the Singer valve has been an exhibit in this case since early in the proceedings. Zukausky, an employee of Eaton, knew of the Swanson valve prior to his conception of the claimed invention. Moreover, Zukausky testified at trial and was therefore available to address any of these items of prior art if Eaton considered that to be appropriate. Eaton was therefore not prejudiced by the introduction of evidence regarding the Ostrowski, Singer and Swanson prior art.

The importance of the Ostrowski and Singer prior art is seen by the similarity of these disclosures to the claims of the Zukausky patent. The Ostrowski patent describes a pilot-operated valve which includes a diaphragm and an insert. Unlike the prior art such as cited in the Zukausky

patent, the Ostrowski patent discloses a valve with an insert secured about its periphery to the diaphragm, and having the pilot inlet hole located through the insert. The preferred embodiment is described as including a molded-in insert, but the patent also contemplates the use of a snap-in insert. The Singer valve is comparable in these respects to the Ostrowski patent, and utilizes a molded-in insert.

Any difference between claims 1–3 of the Zukausky patent and the Ostrowski and Singer prior art are minimal. The preferred embodiment shown in the drawings of the Zukausky patent differs by the inclusion of additional diaphragm material on the top side of the insert. However, there is no language in claims 1–3 of the Zukausky patent which precludes the presence of such additional diaphragm material, or which limits those claims to a snap-in insert design for a pilot-operated valve. These claims read directly upon a molded-in insert design. More particularly, the language of claims 1–3 of the Zukausky patent describes or "reads on" the Ostrowski patent disclosure and the Singer valve.

Evaluation of the prior art involves a consideration of the level of skill in the pertinent art and the differences between the prior art and the claimed invention. The level of skill in the art relating to the Zukausky claimed subject matter is a person having a mechanical background, such as a Bachelor of Science or Master of Science degree, and familiarity with manufacturing processes. A person of ordinary skill in the art relating to the subject matter of the Zukausky patent would have included William Donahue. The differences between the Zukausky claims and the Ostrowski and Singer prior art are minimal, and primarily relate to the presence of additional diaphragm material on the top side of the insert as a result of the molding-in of the insert. However, the Ostrowski patent specifically indicates that the valve described therein could be made to have a snap-in insert.

Moreover, the evidence is that Donahue independently designed the AVC valves exclusively by the use of his ordinary skill and knowledge in the art. There was no showing by Eaton that Donahue knew of the Zukausky valve design prior to Donahue's designing of the AVC valves. At best, there was evidence that Zukausky had conceived of his design in November 1980, the same month that Donahue left the employment of Eaton. But there was no showing that Donahue had access to this information at all. Further Zukausky indicated that a sample of the undercut diaphragm contemplated by the Zukausky patent was not available until January 1981, and testing of the valve design did not start until thereafter.

Eaton has alleged infringement of the Zukausky patent by two different valve designs of AVC. The first design included a full peripheral flange, and the second was different in that slightly more than half of the flange was absent. As to the first design, there has been no showing that infringing activities took place after issuance of the patent. The Zukausky patent issued June 14, 1983. No proof was offered at trial that the first AVC valve design was made, used or sold by defendants after June 14, 1983.

There is also a dispute regarding the applicability of the Zukausky claims to either of the AVC valves sufficient to establish infringement. Claims 1–3 of the Zukausky patent recite the provision of a seal between the diaphragm and the insert periphery to preclude flow therebetween. In contrast, both versions of the AVC valves considered by this court provide for bypass flow between the diaphragm and the insert periphery. Eaton failed to show, and specifically failed to introduce any tests or comparable evidence, that the AVC valves preclude bypass flow.

Immediately upon receipt of Eaton's notice of infringement, Donahue modified the AVC diaphragm by eliminating fifty-one percent (51%) of the peripheral edge to visually demonstrate that the undercut of the AVC diaphragm utilized attachment rather than sealing.

## II.

### A.

Defendants argue that Eaton's claims against D & M and Miller are barred by the applicable statute of limitations, Ind.Code § 34-1-2-2. Eaton's Second Amended Complaint was filed February 28, 1983, adding two additional defendants to the action, Miller and D & M. The counts alleged against them, including misappropriation of trade secrets and confidential information, conspiracy, and wrongful interference with contractual relations, all sound in tort. Defendants argue that because the complaint was filed on February 28, 1983, all claims arising prior to February 28, 1981 are barred by the two year statute. They contend that most, if not all, of the actions alleged in the complaint arose prior to November 26, 1980 and, at the latest, prior to February 28, 1981. Further, defendants maintain that "relation back" under Rule 15(c) is inapplicable in this case because there is no showing that D & M or Miller had actual notice of the institution of the original suit or that, but for a mistake concerning the identity of the party, they would have been added as parties in this action. This court finds no merit in defendants' position.

On October 12, 1982, Eaton filed a motion for leave to amend the original complaint, accompanied by a proposed amended complaint which added Miller and D & M to this suit. This court granted leave to amend on February 1, 1983 and the technical filing occurred February 28, 1983.

Although Eaton presents little relevant authority on this issue, and research by this court has uncovered no additional case law, it does make an apt analogy of this situation to the filing of a complaint accompanied by a petition for leave to proceed *in forma pauperis*. Since complaints accompanied by *in forma pauperis* petitions may not technically be filed until the court has ruled on the petition, several cases have arisen where the complaint and petition were submitted prior to expiration of the statute of limitations, but no court action or technical filing of the complaint occurred until after expiration of the statutory period. In such cases, the complaint is deemed filed when submitted to the clerk although court action on the petition and the technical filing date may occur at a later time. *Rosenberg v. Martin*, 478 F.2d 520, 522 & n. 1a (2d Cir.) *cert denied*, 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973); *Salahuddin v. Milligan et al*, 592 F.Supp. 660, 661 (S.D.N.Y.1984); *Allah v. Commissioner of Department of Correctional Services*, 448 F.Supp. 1123, 1127 (N.D.N.Y.1978).

The same principle should apply with respect to the action on the proposed amended complaint. This was, in fact, the holding in *Rademaker v. E.D. Flynn Export Co.*, 17 F.2d 15 (5th Cir.1927). *Rademaker* involved an application for leave to amend the complaint by adding a new party defendant. The application, which set forth the exact nature of the amendment sought, was filed prior to expiration of the statutory period. However, once leave was granted, the technical filing of the amended complaint did not occur until after expiration of the statute of limitations. The court rejected the defendant's statute of limitations defense and treated the proposed amendment as the amended complaint itself.

Similarly, plaintiff in this case has set forth with particularity the amendment of the complaint desired by filing with its motion for leave to amend a proposed amended complaint. As stated by the Fifth Circuit, "While there are cases to the contrary, we think the better rule, supported by the weight of authority, is that an application for leave to amend, as full and comprehensive as this one in its averment of facts, stands in place of an actual amendment." *Id.* at 17.

Thus, it is this court's position that once the plaintiff has filed its proposed amended complaint accompanied by a motion for leave to amend within the statutory period, the statute of limitations is tolled even though the court order granting leave to amend and the technical filing of the amended complaint occur after the run-

ning of the statute of limitations. This is the only just and proper result since once leave to amend has been requested and a proposed complaint is on file, the plaintiff has taken those steps within his power to toll the statute and must await the appropriate court order.

### B.

In its order of July 22, 1982, 688 F.2d 842, the Court of Appeals entered footnote 12 as follows:

[12. Eaton argues that the requirement of balancing the equities is inapplicable here because "Defendants[s] actions were done with full knowledge of Plaintiff's rights and with an understanding of the consequences that might ensue." Appellant's Br. at 37; see *ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.*, 62 Ill.App.3d 671 [20 Ill.Dec. 160], 379 N.E.[2d] 1228, 1239 (1st Dist.1978). Assuming that Indiana reconizes the principle expressed in *ABC Trans National*—that equities are not to be found in favor of a party that knowingly transgresses the rights of another—we do not believe that defendants' conduct here is sufficiently egregious to prevent the district court from finding the equities in their favor. Defendants here, on this preliminary showing, have neither misappropriated nor improperly revealed any Eaton trade secrets. Although we have concluded that Krzewina and Donahue may have revealed confidential Eaton information to non-Eaton employees on two occasions in violation of their employment contracts, we have also found that those contract violations appeared to be minor in nature and scope. Thus, we are unwilling to deny defendants the benefits of a balance of the equities because of those incidents alone. Indeed, Krzewina's and Donahue's conduct appears to be much less egregious than the actions of the former employees in *ABC Trans National* who set up a competing business using their former employer's time, equipment and customers, began operating the business while many of them were still employed by their former employer, and succeeded through employee resignations in eliminating their former employer's offices in four large cities.

More fundamentally, the plaintiff in *ABC Trans National* predicated its request for an injunction upon the theory that its former employees breached their *fiduciary duties* of loyalty and fidelity by actively establishing a competing business with the employer's resources. See 62 Ill.App.2d at 683 [20 Ill.Dec. at 168–69], 397 [379] N.E.2d at 1236–37. Indiana also recognizes that employees are charged with the fiduciary duty of loyalty to their employer. See *In re Uniservices*, 517 F.2d 492, 497 (7th Cir.1975); *Westervelt v. National Paper & Supply Co.*, 154 Ind. 673, 57 N.E. 552 (1900). Eaton has not alleged in its complaint, however, that defendants Krzewina and Donahue breached their fiduciary duties to Eaton, even though many of the acts which Eaton complains of (e.g., soliciting Eaton customers and suppliers and designing a competing valve while still employed by Eaton) may constitute breaches of fiduciary duty in contrast with tortious conduct or contract breaches. Because the *ABC Trans National* court scrutinized the defendants' conduct there under an equitable theory not presented here, we are even more hesitant to apply the holding of that case to the instant case.]

For purposes of this discussion it will be assumed that footnote 12 is a part of the law of this case and not just dicta. Such assumption is most generous to this plaintiff. In response to this proffered invitation of the Court of Appeals the plaintiff here did amend in an attempt to accept. Its pleadings do in fact allege enough to arguably come within the concept concerning breach of a fiduciary duty. The proofs actually offered on this subject fall short of the mark under the authorities cited in footnote 12 and other cases cited here by counsel and found by the court. The conduct of Krzewina and Donahue while not puristically ideal falls far short of the kind

of egregious conduct found in the *ABC Trans National.* The same can be said for the *Uniservices, Westervelt* and *Bay v. Kroner* [83 Ind.App. 541, 149 N.E. 184 (1925)] cases. There is a simple failure of proof on this issue.

The activity undertaken by Krzewina and Donahue was the reasonable minimum necessary in establishing a new business in an industry in which plaintiff Eaton had a virtual monopoly. It is also significant to note that neither Krzewina or Donahue had any agreement with Eaton which required them to give notice of leaving or that restricted their ability to compete with Eaton.

### C.

The court turns now to the issues of misappropriation of trade secrets and confidential information. Eaton's complaint includes counts against all defendants based on misappropriation of trade secrets and confidential information, breach of contract not to disclose trade secrets, conspiracy to misappropriate trade secrets, unfair competition, interference with contracts. All of these claims are premised on Eaton's allegation that Krzewina and Donahue, individually, or in concert with other defendants, used alleged trade secrets or confidential information that they had gained during their employment with Eaton.

The trade secrets and confidential information issues have been extensively litigated in the evidentiary hearing in this case held September 24, 1981. The court will address these issues to the extent that the evidence presented at trial elaborates or modifies the evidence presented at that hearing and incorporated into this court's findings of fact and conclusions of law. *See, Eaton,* 526 F.Supp. at pp. 1174–82.

Eaton contends that significant disclosures of evidence have taken place since the evidentiary hearing by way of Miller's deposition and the trial testimony of Donahue. It reiterates its argument that Donahue took confidential information that constituted trade secrets from Eaton's patent files. The additional evidence presented at trial demonstrates that all Donahue removed from the Eaton files were clean copies of patents, i.e., patent information readily available to the public. Moreover, the actual copies of the patents delivered to Attorney Emhardt for evaluation are devoid of Eaton notations or Eaton summaries for five years and the notes on the patents were not made from Eaton files. This evidence simply does not support Eaton's allegation that Donahue inspected and copied patent materials from the Eaton Controls Division at Carol Stream, Illinois.

Eaton also brings before the court an allegation that Krzewina passed to Miller of D & M in late 1979 or early 1980 confidential Eaton accounting data relative to Eaton costs and profits margins in the manufacture of the Eaton valve. Krzewina testified that it was his belief that cost figures of Eaton were confidential. No evidence was introduced, however, as to what costs figures were being referred to, whether the cost figures were accurate or whether the cost figures were, indeed, protectible interests and confidential information. Absent such a showing it is impossible for this court to make a finding that the cost information was confidential and that a misappropriation has taken place. Moreover, the evidence suggests that Miller was already aware of the cost figures of component parts of the Eaton valve through his own efforts in the market place.

Eaton further contends that Miller's personal contact with Circle Plastics in January 1980 for the purpose of price checking was: (1) evidence of contact with suppliers; and (2) evidence of Krzewina's and Donahue's giving Miller a confidential drawing (Exhibit 124). Prior to January 14, 1980 D & M had within its possession at least two Eaton drawings relating to the Eaton dishwasher inlet valve then being supplied to D & M by Eaton. The drawings in question were Eaton drawings BK–23787 and DK–26741 (Confidential Exhibit 124). Miller testified that acting under the orders of Sam Regenstrief, the Chairman of D & M, the drawings were sent to Circle Plastics of Circleville, Ohio in order to obtain quotations for the manufacture of the Eaton

valve body and the Eaton guide tube. Miller stated that the confidential Eaton drawings were obtained from the D & M Engineering Department. The Eaton prints were allegedly stored in the D & M Engineering Department and that after the drawings were used, they were to be returned to the D & M Engineering Department. Although the engineering files of D & M were subpoenaed by Eaton in this litigation, no copy of the drawing of Eaton Confidential Exhibit 124 was found in those files. There is no doubt, however, that the Eaton drawings were transmitted to Circle Plastics on or about January 14, 1980, as they are referred to by Circle Plastics in its quotation of January 23, 1980. Files of Circle Plastics relating to the January 23, 1980 quotation were destroyed by Circle Plastics at the request of Miller after its records were subpoenaed in this case. Such information was reported to the court on September 16, 1981 by Mr. D. Mattingly, counsel for AVC, Krzewina and Donahue.

Because of the destruction of documents which has occurred in this case and the testimony of witnesses, Eaton concludes that Miller and D & M were wrongfully in possession of Eaton drawings of its valve products. The alleged possession of Eaton drawings by Miller and D & M in January of 1980 came at a time when Miller, Krzewina, Donahue and D & M were discussing the establishment of a valve business in competition with Eaton and at a time approximately eleven months prior to Krzewina and Donahue resigning their employment from Eaton. Eaton, therefore, concludes that the drawings of Eaton were supplied by Krzewina and Donahue, that possession of the drawings by Miller was wrongful and that the drawing did contain proprietary information of Eaton.

The record in this case, however, contains no evidence that Eaton Confidential Exhibit 124 passed through the hands of Krzewina or Donahue or that, in fact, it was in the hands of any defendant in the lawsuit. Moreover, Miller's contact with Circle Plastics was for his own purpose, to price check the cost of a water inlet valve. The check was on an Eaton valve and not on the design of the AVC valve that came into existence almost a year later. The drawing sent to Circle Plastics was from D & M's own files, and Circle Plastics specifically testified that Exhibit 124 was not the drawing received.

Eaton next alleges that seven specific design aspects of the AVC valve were copied by AVC from Eaton. These design features include the following: (1) body main valve seat; (2) diaphragm insert seat, (3) armature-guide tube clearance; (4) noise suppressor; (5) retainer; (6) coil; and, (7) diaphragm insert assembly fixture. Eaton contends that these design features are not available to the public, cannot be discerned from an examination of an Eaton valve (i.e. by direct measurement), were not developed independently by Krzewina and Donahue but were, in fact, misappropriated directly from Eaton.

The testimony of Allen T. McDonald, defendant's expert witness, and a professor of Mechanical Engineering at Purdue University in West Lafayette, Indiana, refutes these conjectures. McDonald testified that the operation of a water inlet valve is a well-known technology which is used in a variety of fields. Hence, it is not surprising that some similarities exist between valves. In response to Eaton's allegations that the tolerance of the main valve seat and the diaphragm insert seat in the AVC body is identical to that of the Eaton valve body, McDonald stated that the tolerance used by AVC on their prints are industry standards. With respect to the armature-guide tube clearance tolerance, Eaton states that the tolerance in the AVC valve was identical to that of the Eaton valve insofar as the important lower limit. The fact remains that the clearance in the two valves differs in the upper limit to make the valves "substantially" identical but not precisely identical in this respect.

The AVC valve also utilizes a noise suppressor molded into the valve body. Although the radius, the tolerance on the radius and the cone angle were found to be identical to that of Eaton, Donahue testi-

fied that he knew the Eaton cone angle from prior working experience and that he relied on nothing but his memory with respect to his design of the AVC noise suppressor. Going on to the retainer, Donahue stated that the retainer design employed in the AVC valve was, again, very similar but not identical to, the retainer in use by Eaton. Raymond McCarty, the Production Manager of Eaton, testified that the Eaton retainer was specifically designed for a noise control purpose. While stating that the chief function of the part was to retain the flow washer in its pocket, Donahue did acknowledge that the part had a tendency to reduce noise.

Further, Eaton makes much of the fact that the coil used in the AVC valve is identical to that of the Eaton valve and alleges that all the coil information came directly from Eaton drawings. The deposition testimony of Stanley Bickhart of Wabash coil establishes that the coil purchased for the AVC valve from the Company is a shelf item used for many years in different applications. Moreover, the 5,200 turn 39 wire alleged to be a trade secret is a combination for coil bobbin that is well known in the industry. The court finds that the only design feature that does not appear to be in the public domain and is similar but, again, not identical, is the insert-assembly feature.

■ Having evaluated the arguments and evidence proffered by Eaton at the October 22, 1984 trial, the court concludes that Eaton has presented no additional evidence of appreciable significance to support its contentions as to trade secrets and confidential information. This court's findings of fact and conclusions of law of November 25, 1981 stand affirmed. Because Eaton has not carried its burden of proof on the issue of misappropriation of trade secrets and confidential information, Eaton's claims of breach of contract not to disclose trade secrets, conspiracy to misappropriate trade secrets, unfair competition and interference with contracts must also fail.

## III.

As indicated above this case was originally filed on July 9, 1981. On July 13, 1981 an application was made for issuance of a patent, which patent was issued under No. 4,387,878 (878 patent) on June 14, 1983. It is here asserted that claims numbered 1, 2 and 3 only of the aforesaid 878 patent are infringed. Those claims are as follows:

1. A diaphram assembly for a pilot operated valve comprising:

a diaphragm insert having a first side, a second side, and a peripheral edge between the first and second sides, means defining a pilot outlet aperture in said insert and a pilot supply aperture extending between the first and second sides; and

a flexible diaphragm including an annular seat portion having first and second sides, said diaphragm further including a peripheral rim portion and an interconnecting relatively flexible web portion, means defining a shouldered sealing retention surface interconnected between said annular seat portion and said web portion and configured to complement and interengage with said peripheral edge, said first side of said diaphragm disposed adjacent the insert and said second side of said diaphragm defining a valving surface for engaging a valve seat, at least one fluid supply aperture through said diaphragm and in fluid communication with said pilot supply aperture, means defining a fluid seal radially inwardly of said fluid supply aperture, the ingerengagement of said shouldered sealing retention surface and said peripheral edge serving to define a seal between said diaphragm and said insert peripheral edge whereby passage of fluids between said insert and said diaphragm is precluded.

2. The invention of claim 1 in which said shouldered sealing retention surface of said diaphragm is defined by an inwardly projecting surface which forms adjacent thereto an annular recess having at least a portion of the peripheral edge of said diaphragm insert received therein.

3. The invention of claim 2 in which said diaphragm insert includes a wall portion which is substantially orthogonal to the insert peripheral edge and which is at least partially received within said annular recess of said diaphragm.

The principal dispute in the trial of this case on its merits related to patent issues. The issues will be taken up, but not necessarily in the order of their importance. It is claimed that under 35 U.S.C. § 282 the notice of prior art was inadequate. It is also alleged that the application for the aforesaid 878 patent committed a fraud on the patent office. (For this author's analysis of that issue sitting in another court see *Eudy v. Moter-Guide, Herschede Hall Clock*, 651 F.2d 299 (5th Cir.1981)). The more substantial issues relate to the alleged infringement of the aforesaid 878 patent by the defendants and the alleged assertion of the invalidity of said patent under §§ 101–103 of Title 35 U.S.C. by the defendants.

## A.

■ This court need not tarry long with regard to the two preliminary issues. In the trial of this case and prior thereto there was substantial compliance with the letter and spirit of 35 U.S.C. § 282. That statute requires an adverse party to give certain information regarding patents, publications and other prior art materials upon which that party intends to rely in asserting invalidity or non-infringement. It is also correct that proof of such matters may be made in the absence of such notice with the court's approval and on such terms as the district court may require. A district court has wide discretion with regard to the allowance of proofs relating to prior art. The United States Court of Appeals for the Federal Circuit has yet to rule precisely upon the scope and dimensions of § 282. Prior to its coming into being the cases were nearly uniform in investing in a district trial judge wide discretion in regard to the proof of prior art in the absence of specific notice. *See Shatterproof Glass Corp. v. Guardian Glass Co.*, 462 F.2d 1115 (6th Cir.1972) and *Thermo King Corp. v. White's Trucking Service, Inc.*, 292 F.2d 668 (5th Cir.1961). In this circuit the Court of Appeals has ruled that a district trial judge is permitted to receive proof of prior patents in the absence of the prescribed 30 day notice if the plaintiff is not thus deprived of an adequate opportunity to present its case. *See Henry Mfg. Co., Inc. v. Commercial Filters Corp.*, 489 F.2d 1008 (7th Cir.1972). This case was tried by a very experienced and highly competent trial counsel who were thoroughly qualified to deal with all questions of prior art. A more than adequate opportunity to present the issues on prior art were afforded to this plaintiff. Specifically, the prior art dealing with the Ostrowski patent, the Singer valves and the work of West Swanson were known by the plaintiff Eaton. The Ostrowski patent was itself provided to the plaintiff in plaintiff's deposition Exhibit No. 111 on September 18, 1981 during the deposition of patent attorney C. David Emhardt. The Singer valve as shown in pertinent respects in the preferred embodiment disclosure in the Ostrowski patent. Zukausky, the alleged inventor of this 878 patent, has been familiar with the Singer valve since at least 1981 and therefore during the pendency of his patent application as well as prior to the trial of this case. Zukausky has been familiar with the work of Wes Swanson since prior to conceiving the subject matter claimed in the 878 patent and therefore since the filing of that application. Zukausky was present at the trial of this case and was fully able and available to speak on these matters and issues and did so. There was no prejudice whatsoever worked on the plaintiff in this case in regard to any alleged non-compliance with the strict provisions of § 282. The reasoning and result of the Court of Appeals for this circuit in *Sutter Products Co. v. Pettibone Mulliken Corp.*, 428 F.2d 639 (7th Cir.1970) well supports the exercise of discretion by this district judge in this case and well supports the conclusion that the values in 35 U.S.C. § 282 were not here abused.

### B.

As is often the case in modern patent litigation the defendants are here alleging fraud on the patent office. The definitions and standards of proof recently announced are found in *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed.Cir.1983); *Driscoll v. Cebalo*, 731 F.2d 878 (Fed.Cir.1984); and *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144 (Fed.Cir.1983). In spite of the able efforts to present this issue beginning at page 33 of the defendants' brief the record here falls short of the announced requisites of the statute and of 35 CFR § 1.56. This court finds that there is a failure of proof by the defendants on the issue of fraud on the patent office and therefore respectfully declines to bottom its decision on that concept.

### C.

■■■ The court must now turn to the more difficult and substantial issues in the case dealing with the validity of the patent with reference to novelty under § 102 and obviousness under § 103. An appropriate and fundamental backdrop for the consideration of the validity issue is the presumption of validity as found in 35 U.S.C. § 282 and the placing of the burden of establishing invalidity of a patent or any claim thereof on the party asserting such invalidity. The most recent reading of that provision is found in *Jones v. Hardy*, 727 F.2d 1524 (Fed.Cir.1984). Two recent decisions give some live meaning to the statutory presumption of validity. *See D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144 (Fed.Cir.1983) and *SSIH Equipment, SA v. USIPC*, 718 F.2d 365 (Fed.Cir.1983). Some fairly fine points with regard to the statutory presumption of the validity in this evidentiary context must be made. That presumption does not control regarding the effect of prior art, especially as to prior art not cited by the patent examiner. Defendants rely upon three examples of prior art, none of which were cited by the examiner of the 878 patent and each of which is more pertinent than the art that was before the examiner. The introduction of prior art more pertinent than that considered by the examiner makes it more likely that the burden of persuasion imposed by the presumption of validity will be carried. *See Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563 (Fed.Cir. 1983) and *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506 (Fed.Cir.1984). A rebuttal of the aforesaid presumption of validity may be more easily had and more often achieved in reliance on prior art more pertinent than that considered by the examiner. *See Aktiebolaget Karlstads Mekaniska Werkstad v. USITC*, 705 F.2d 1565 (Fed.Cir.1983). There is certainly no presumption that the examiner considered uncited art. *See Lindemann Maschinenenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452 (Fed.Cir.1984).

■■■ The defendants urge that the 878 patent is invalid for lack of novelty under 35 U.S.C. § 102. To reach that conclusion there must be demonstrated the existence of a single patent which teaches all of the elements of the invention. *See Carman Industries v. Wahl*, 724 F.2d 932 (Fed.Cir. 1983). Given the teaching of *Carman* and the record in this case this court cannot find that the Ostrowski 154 patent fits squarely and unequivocally into a § 102 mold. Therefore this court declines to bottom a decision of invalidity on § 102.

■■■ Title 35 U.S.C. § 103 presents a far more difficult and fundamental challenge to the plaintiff as the proponent of this 878 patent. It is elementary that patentability requires that the claim subject matter be new, useful and unobvious. *See Roberts v. Sears, Roebuck & Co.*, 723 F.2d 1324 (7th Cir.1983) and *Dickey-John Corp. v. International Tapetronics Corp.*, 710 F.2d 329 (7th Cir.1983). These are separate standards and each must be met for a patent claim to be valid. *Republic Industries, Inc. v. Schlage Lock Co.*, 592 F.2d 963 (7th Cir.1979).

35 U.S.C. § 103 states:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of

this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

To fulfill the obligations imposed on the court under § 103 it must consider the level of skill and the art at the time the alleged invention was made and the scope and content of the relevant prior art. The court must then decide if, in view of the differences between the claim subject matter and the prior art, the invention as a whole would have been obvious of ordinary skill and the art at the time the invention was made. *Lear Siegler, Inc., v. Aeroquip Corp.*, 733 F.2d 881 (Fed.Cir.1984). From all of the evidence this court is persuaded that the subject matter claimed in the Zukausky 878 patent is invalid as being obvious under the aforesaid § 103. The level of skill and the art relating to the design of an inlet valve as claimed in the 878 patent would at least be a person having mechanical engineering background, a bachelor's or master's degree, and familiarity with manufacturing processes. A person of ordinary skill in the art would include William Donahue. The scope and content of the prior art has already been shown to have included Ostrowski, Singer and Swanson valve design.

The difference between the claimed invention and this prior art, particularly the Ostrowski and Singer valves are at best minimal. Basically the only differences between the 878 claims and the Ostrowski and Singer valves is the presence of additional portions of the rubber diaphragm on the top side of the inserts. This material is present as a result of the molding-in insert into the diaphragm. The Ostrowski patent specifically contemplates that the "insert could be designed to snap into the diaphragm". This would both contemplate and require the removal of that extra portion of the diaphragm. The resulting embodiment would look and function identically with the 878 design. The differences between the claim subject matter and the Ostrowski and Singer valves are minimal and any changes necessary to lead to the 878 design would have been obvious to one skilled in the art at the time Zukausky made his design. This conclusion is well supported by the testimony at trial of both witnesses Henry and McDonald which this court specifically credits. There is some considerable discussion with reference to the fact, that the Ostrowski patent describe a molded-in insert and the question is raised as to whether or not there is teaching that it should be modified to a design having a snap-in insert. There is a comment in the Ostrowski patent that the snap-in design "is not considered as satisfactory". It would appear that reference in the Ostrowski patent represents a preference for an insert molded-in. The use of snap-in insert has been well known and was shown in various patents cited in the 878 application, including the Dolter patent which cover one of the plaintiff's valves. It is not necessary that the prior art teach the claimed invention in so many words. The standards announced in *In re Sheckler*, 438 F.2d 999 (CCPA 1971) and recently approved in *In re Sernaker*, 702 F.2d 989 (Fed.Cir.1983) are still relevant. It is not necessary that the prior art suggest expressly or in so many words the changes or possible improvement that might be made. All that is required to show obviousness is that the applicant make his claimed invention merely by applying knowledge clearly present in the prior art.

This court need not dwell too long on the subject of secondary considerations because of the aforesaid basic finding of obviousness under § 103. Basically these secondary considerations are absent and little more need be said with regard to them.

## D.

The court must turn now to the infringement issues and elects to deal with them notwithstanding the previous finding of obviousness under § 103. Patent infringement arises by the making, using or selling of a patented invention within the United

States during the term of the patent therefor. 35 U.S.C. § 271(a). The plaintiff Eaton charges the defendants AVC and D & M with infringing the aforesaid claims 1, 2 and 3 of the Zukausky 878 patent. One of the basic requirements for the finding of infringement is that there be infringing activities during the term of the patent in issue. The first valve design manufactured by AVC and sold to D & M comprised a pilot operated valve including a full 360° flange on the perimeter of the insert and received within a complimentary recess in the diaphragm for the purposes of attachment. The plaintiff Eaton here has failed to show that any valves of this design were made, used or sold after the issuance of the 878 patent on June 14, 1983. The major area of this disagreement centers on whether the two embodiments of the AVC valve meet the limitation of the claims that there be a aseal between the diaphragm and the insert to preclude flow therebetween. The plaintiff Eaton has failed to introduce evidence establishing that as to any of the AVC valves there is a seal between the diaphragm and insert in a manner encompassed by the terms of the 878 patent. The evidence at trial was to the effect that the original AVC design with the 360° flange did not provide such a seal. It was further indicated that the present AVC design with a partial flange would also provide bypass flow and in fact, bypass flow than the earlier design. The testimony of both Donahue and McDonald to this effect is credited here.

The plaintiff also raises an issue as to certain dimensions of the current AVC valve design in effort to support its argument on infringement. It asserts that there would be a tight or "interference" fit between the diaphragm and the flanged portion insert perimeter. The evidence indicates that there is something over 0.007 inches clearance between the diaphragm and the outer edge of the insert in the art without the flange and the unflanged portion constitutes more than half of the insert perimeter. There is some speculation as to the "stretching" of the diaphragm somehow providing the requisite seal.

There was no proof offered that the supposed stretching or any other aspect of the current AVC valve would result in the required sealing action. Apparently no amount of stretching would close off the pie shaped spaces at the areas between flanged and unflanged portions of the insert. No competent evidence was introduced to establish the presence of a seal. There was testimony that the tests might have been run to verify this feature but no such tests were presented to the court. The court must conclude that the plaintiff has failed to establish that the AVC valves meet the claimed limitation requiring there be a seal between the diaphragm and the insert.

This court is familiar with the concept of file wrapper estoppel or prosecution history estoppel as most recently defined in *Hughes Aircraft Co. v. United States*, 717 F.2d 1351 (Fed.Cir.1983). Although there might be some temptation to rely on that concept in this case it is unnecessary to do so and this court declines that part of the defendants' invitation.

The defendants here have sustained their burden under § 103 and therefore the 878 patent is invalid.

The Clerk shall enter judgment on all issues in favor of the defendants and against the plaintiff. Costs are assessed against the plaintiff.

SO ORDERED.