**Stephen M. SHEETS, Plaintiff,**

v.

**Marvin D. DZIABIS, et al., Defendants.**

**No. S87–130.**

United States District Court,
N.D. Indiana,
South Bend Division.

Jan. 2, 1990.

**308**

Martin T. Fletcher, Jay L. Toney, Fort Wayne, Ind., for plaintiff.

John T. Mulvihill, South Bend, Ind., Paul Freehling, Chicago, Ill., for Marvin D. Dziabis.

Joseph L. Amaral, South Bend, Ind., for David Dziabis.

## MEMORANDUM AND ORDER

MILLER, District Judge.

■ This cause comes before the court on the plaintiff's motion for partial summary judgment. The matter has been fully briefed and is ripe for review. Numerous issues pend, but resolution of those issues depends on whether the syndication interests that plaintiff Stephen M. Sheets purchased in the stallions Aly North and Speedy Nijinsky were "securities" as that term is defined by the Federal and Indiana Securities Acts.[1]

Dr. Marvin Dziabis[2] also has filed a renewed motion to dismiss based on the contention that the alleged oral representations made in connection with the sale of the syndicate interests are not sufficient to bring the transaction within the jurisdictional reach of the federal securities laws, and that the court therefore should dismiss the case because it lacks subject matter jurisdiction. Because this motion involves matters outside the pleadings and the same issue as the plaintiff's motion for summary judgment, the court addresses Dr. Dziabis' arguments in support of dismissal in conjunction with Mr. Sheets' summary judgment motion. *See Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 279–281 (7th Cir.1986).

The court also addresses the motion of Dr. Dziabis' son, defendant David Dziabis, for partial summary judgment on statute of limitations grounds.

### Standard of Review

■ A party seeking summary judgment must demonstrate that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir.1989). Should that showing be made in a case in which the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Zayre Corp. v. S.M. & R. Co., Inc.*, 882 F.2d 1145 (7th Cir.1989); *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989). If he fails to do so,

---

**1.** This issue was previously before the court in the context of a motion to dismiss filed by defendant Marvin Dziabis. On June 15, 1988, the court denied the motion to dismiss, noting that Mr. Sheets claimed that alleged oral representations made in connection with the sale of the fractional interests brought the transactions within the definition of an investment contract. Because development of the case outside the pleadings was necessary for the court to determine whether the syndication interests were securities, the matter is now before the court on

a motion for summary judgment. Whether a particular arrangement is an investment contract is a question of law to be determined by the court. *Ahrens v. American–Canadian Beaver Co.*, 428 F.2d 926, 928 (10th Cir.1970).

**2.** When referring to the defendants individually, the court will use their full names, or refer to defendant Marvin Dziabis as Dr. Dziabis and refer to his son, defendant David Dziabis, as Mr. Dziabis.

summary judgment is proper. *United States v. Selenske*, 882 F.2d 220, 221 (7th Cir.1989). A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. *Gomez v. Chody*, 867 F.2d 395 (7th Cir.1989); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656 (7th Cir.), *cert. denied* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Schroeder v. Copley Newspaper*, 879 F.2d 266, 269 (7th Cir. 1989); *Wolf v. Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989).

The parties cannot rest on mere allegations in the pleadings, *Zayre Corp. v. S.M. & R. Co., Inc.*, 882 F.2d 1145, 1148 (7th Cir.1989); *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 931 (7th Cir.1989), or upon conclusory allegations in affidavits. *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir.1989). The court must draw any permissible inferences from the materials before it in favor of the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Vachet v. Central Newspapers, Inc.*, 816 F.2d 313 (7th Cir.1987), as long as the inferences are reasonable. *Spring v. Sheboygan Area School District*, 865 F.2d 883, 886 (7th Cir.1989); *Mays v. Chicago Sun-Times*, 865 F.2d 134, 136 (7th Cir.1989). The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law. *Local 1545, United Mine Workers of America v. Inland Steel Coal Co.*, 876 F.2d 1288, 1293 (7th Cir.1989).

With these standards in mind, the court turns to the facts disclosed by the parties' submissions, drawing all reasonable inferences in favor of the defendants, the non-moving parties.

### Facts

While most of the pertinent facts are undisputed, the parties characterize the facts differently. The following facts are not in dispute. After discussions with Dr. Dziabis, Mr. Sheets purchased a fractional interest in two stallions from the International Thoroughbred Bloodstock Agency, Inc. ("ITBA").

The ownership interest of the syndicated stallions was divided by ITBA into forty separate interests (sometimes referred to as "shares"). With the purchase of a stallion share, the owner of the share was entitled to breed that stallion one time per year. The share owner was also responsible for one fortieth of the horse's upkeep. The annual right to breed a stallion is referred to as a "breeding season". Dr. Dziabis told Mr. Sheets that the breeding seasons could be sold in advance, and that limited partnerships had been formed for the purpose of acquiring and breeding mares. The owners of the stallion shares would have the first opportunity to sell their seasons to the limited partnerships for the amount that was reflected on a letter they received when they purchased their shares.

During the discussions, Dr. Dziabis told Mr. Sheets that he thought it was a good place to put money, that there was an almost 100% return on the selling of the breeding seasons, and that even after selling the seasons, the purchaser would still retain his fractional "share" of the stallion.

The stallion share owners had additional options regarding their breeding rights. They could buy mares to breed with the stallions, they could breed mares they already owned, or they could sell the seasons to a third party. The syndication agreements stated that: "The principal purpose for which each Member owns or acquires his interest in the Stallion is to assure him the right to breed mares owned by him to the Stallion." Mr. Sheets owned no mares.

After the discussions with Dr. Dziabis, Mr. Sheets bought a stallion share in the Aly North syndication for $40,000.00, and a stallion share in the Speedy Nijinsky syndication for $20,000.00. Shortly thereafter, Dr. Dziabis transported and delivered Mr. Sheets' checks to the ITBA office in Lexington, Kentucky. ITBA did not register

the stallion syndicates with the Indiana Securities Commission.

### Syndication Units as Securities—The Parties' Arguments

Mr. Sheets contends that the syndication interests, coupled with Dr. Dziabis' oral representations and the letters promising limited partnerships providing a ready market for the owner's breeding rights, create securities within the meaning of federal and Indiana law. In support of this contention, Mr. Sheets first argues that the stallion manager had responsibility for advertising and promoting the stallion and caring for and maintaining the animal, while the share owners had no practical control over the management of the syndicate. Mr. Sheets also claims that ITBA provided the significant managerial efforts upon which the enterprise's success or failure would depend, and that the fractional interest owners had no real authority to control the syndicate manager's actions.

Mr. Sheets further claims that the syndication was a common enterprise joining each of the owners of the stallion shares into a common business venture to govern the standing of the stallions for breeding purposes. Mr. Sheets claims that there was a pooling of funds by multiple investors in both the Aly North and Speedy Nijinsky syndicates.

Mr. Sheets also claims that his one-fortieth interest in the stallions was of little value without the breeding rights, and that ITBA had determined to set up limited partnerships that would purchase mares and provide a ready market for those breeding rights. The letters Mr. Sheets received indicated that he could sell his annual breeding rights for an assured price. Mr. Sheets contends that he had to rely on ITBA's managerial and entrepreneurial efforts for the formation and implementation of the limited partnerships. Mr. Sheets also argues that Dr. Dziabis' claim that he would receive almost a 100% return on the selling of the breeding seasons, if he agreed with ITBA to place three breeding seasons with the limited partnerships, con-

firms the syndicate units' investment character.

Dr. Dziabis characterizes the facts differently and contends that the principal purpose for owning an interest was to assure the right to breed mares with the stallions, and that the members were to provide their own mares for breeding.

Dr. Dziabis also relies on the case of *Kefalas v. Bonnie Brae Farms*, 630 F.Supp. 6 (E.D.Ky.1985), in which the court held that a thoroughbred stallion syndication agreement was not an investment contract due to a lack of common venture and the fact that profits were not to be derived solely from the entrepreneurial or managerial efforts of others. Dr. Dziabis argues that his representation that Mr. Sheets could sell three of the breeding seasons to limited partnerships does not create a common enterprise in which the profits were to be derived solely from the efforts of others. According to Dr. Dziabis, the facts that each member owns a distinct right to breed a mare to the stallion during each breeding season, and that the member can choose among a number of options as to how he goes about accomplishing the exercise of the right, takes the scheme out of the realm of a common enterprise.

Dr. Dziabis also argues that the members in the syndicates were not led to expect to receive profits solely from the syndicate manager's efforts, but many factors (including the individual member's decisions regarding the breeding with the mares, the quality of particular mares, the trainer's work, and the results of a particular racing season) lay outside of the syndicate manager's control. Dr. Dziabis claims that a genuine issue of material fact exists with regard to the extent of the syndicate manager's role in the derivation of profits for members.

### Discussion

The 1933 Securities Act and the Indiana Securities Act define a security in essentially the same language:

"Security" means a note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or

participation in a profit sharing agreement, commodity futures contract, option, put, call, privilege, or other right to purchase or sell a commodity futures contract, margin accounts for the purchase of commodities or commodities futures contracts, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under the title or lease, or, in general, an interest or instrument commonly known as a "security", or a certificate or interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant, option, or right to subscribe to or purchase, any of the foregoing.

IND. CODE 23–2–1–1(k). Indiana's definition of "security" under the Indiana Securities Act is functionally equivalent to the federal definition. 15 U.S.C. § 77b(1); *Wisconics Engineering, Inc. v. Fisher,* 466 N.E.2d 745, 760 (Ind.App.1984), *citing American Fletcher Mortgage Co., Inc. v. U.S. Steel Credit Corp.,* 635 F.2d 1247, 1253 (7th Cir.1980), *cert. denied* 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981).

■ A security exists where there is (1) an investment, (2) in a common venture, (3) premised upon a reasonable expectation of profits, (4) to be derived from the entrepreneurial or managerial efforts of others. *American Fletcher Mortgage Co.,* 635 F.2d at 1253.[3] Whether a security is involved or not depends on the transaction's economic realities in light of legislative intent. *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 848, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975).

The seminal case interpreting the term "investment contract" is still *SEC v. W.J. Howey Company,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), which involved the sale of narrow strips of land in citrus groves to prospective investors. Investors were promised a warranty deed to the land and were given the option, but not required, to lease their strips of land to a service company controlled and managed by the same people who controlled and managed the Howey Company. The majority of the investors were not Florida residents and were characterized by the Court as people "who lack the knowledge, skill and equipment necessary for the care and cultivation of citrus trees." *Howey,* 328 U.S. at 296, 66 S.Ct. at 1101.

In holding that the scheme involved the sale of an investment contract, which by definition is a security, the Court stated that the interest acquired was a security regardless of whether the purchaser accepted the optional management contract.

This conclusion is unaffected by the fact that some purchasers chose not to accept the full offer of an investment contract by declining to enter into a service contract with the respondents. The Securities Act prohibits the offer as well as the sale of unregistered, non-exempt securities. Hence, it is enough that the respondents merely offer the essential ingredients of an investment contract. *Id.* at 300–01, 66 S.Ct. at 1104.

■ Here, Mr. Sheets was offered an opportunity to purchase stallion shares plus the additional opportunity to place his breeding rights with limited partnerships for an assured price. In essence, ITBA was acting as a broker for syndicate members who, like Mr. Sheets, owned no mares for breeding. Because Mr. Sheets was told that limited partnerships existed that would buy his breeding seasons for an assured price, the scheme must be considered as a whole, including not only the syndicate agreement itself (which, standing alone, would not be a security), but also the offer of the limited partnership to purchase his breeding rights. Not only the form of the documents but the substance of the transaction must be considered. *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 352–53, 64 S.Ct. 120, 124–25, 88 L.Ed. 88 (1943).

---

**3.** Dr. Dziabis does not dispute that Mr. Sheets' purchase of the stallion syndicate memberships involved the investment of money or that the purchases were premised in a reasonable expectation of profits.

In this case, Mr. Sheets relied on ITBA because the success of the venture depended on ITBA's success in creating limited partnerships to purchase all the stallions' nominations.

Although Mr. Sheets could have realized a profit from the value of the offspring produced by breeding the stallions to his own mares (assuming he acquired some), he was not required to do so. In fact, Mr. Sheets signed an agreement on March 19, 1986 setting forth his right to: (1) breed his mares; (2) have ITBA select mares on his behalf to be bred to the stallion; or (3) have ITBA place three seasons into limited partnerships managed by ITBA for a price guaranteed to assure him of a return on his investment with no further effort on his part. Options (2) and (3) go far beyond the syndicate agreements in *Kefalas v. Bonnie Brae Farms, Inc.*, 630 F.Supp. 6 (E.D.Ky. 1985), in which the court found that thoroughbred stallion syndication agreements were not securities under federal or Kentucky law.

In *Bonnie Brae*, the syndicate agreements stated that the syndicate manager would do no more than furnish a list of breeders who had inquired as to the availability of the nominations, but selling the nominations would be the owner's job and any profits derived necessarily would depend on the skills and efforts of the owner rather than those of the syndicate manager. *Id.* at 8. This case's facts are more similar to those of *Howey*, in which the Court concluded there was a security. Mr. Sheets was induced to buy the syndicate shares by promises that he could sell his breeding rights to limited partnerships managed by ITBA. While some owners might elect to breed their own mares, it is enough that ITBA offered the essential ingredients of an investment contract. *Howey*, 328 U.S. at 301, 66 S.Ct. at 1104. Profits were to be derived from ITBA's efforts; what was offered amounted to a security even if some purchasers chose not to place their nominations with the limited partnerships. Just as some of the purchasers in *Howey* accepted the optional citrus management contracts and others did not, Mr. Sheets was offered an optional agreement to place his nominations with limited partnerships set up by ITBA. Accordingly, what Mr. Sheets was offered was a security within the meaning of federal and Indiana law.

### Exemption from Registration

It is undisputed that the securities were not registered with the Indiana Securities Commission. Mr. Sheets also claims that the defendants are unable to prove an applicable exemption to the registration requirements of the Indiana Securities Act and that he is entitled to summary judgment on this issue. Dr. Dziabis has not responded to this argument, although he has asserted this defense in his answer to the amended complaint and in his answers to interrogatories.

The burden of proving an exemption from the registration requirements of the Indiana Securities Act is on the party claiming the benefit of the exemption. *Hippensteel v. Karol*, 159 Ind.App. 146, 304 N.E.2d 796, 798 (1973). Mr. Sheets has indicated that it appears to be a virtual impossibility for Dr. Dziabis to show that he reasonably believed that there are no more than thirty-five purchasers of the securities pursuant to IND.CODE 23–2–1–2(b)(10)(A), since the stallion interests were to be divided into forty shares. Since Dr. Dziabis has not come forward with evidence to prove that the syndication units are exempt from the registration requirements, Mr. Sheets is entitled to prevail on this issue. *Celotex Corp. v. Catrett*, 477 U.S. at 324–25, 106 S.Ct. at 2553–54.

### Statute of Limitations

David Dziabis has filed a motion for partial summary judgment raising a statute of limitations defense. Mr. Sheets has moved for partial summary judgment by cross-motion, seeking an order declaring that his state and federal securities law claims are timely and within the applicable statutory limitations period.

### Alleged Violation of Section 12(2) of the Securities Act of 1933

Recognizing the untimeliness of this claim, Mr. Sheets has voluntarily dismissed

his claim under Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), as against David Dziabis, but not against Marvin Dziabis.

### The Remaining Claims

■ With the exception of the fraud claim, which carries a six-year limitations period, the remaining claims are subject to a three-year statute of limitations. Under the Indiana Securities Act, the statute of limitations runs from the date of the plaintiff's actual knowledge of a violation of the Act. IND.CODE 23–2–1–19(g). Under Kentucky Securities law, the three-year period runs from the date of the sale of the securities. Ky.Rev.Stat. § 292.480(3). The "borrowed" limitations period for a claim under Section 10(b) is three years from the time a violation is discovered or within three years from notice of facts which, in the exercise of due diligence, would have led to actual knowledge of the violation. IND.CODE 23–2–1–19(g); *LaRosa Building Corp. v. Equitable Life Assurance Soc'y*, 542 F.2d 990 (7th Cir.1976).

Mr. Dziabis contends that Mr. Sheets had knowledge at the time of the sale (March 15, 1986) that David Dziabis was the general sales manager of ITBA and that the original complaint against Marvin Dziabis alleged involvement in the sales by David Dziabis, but failed to name him in the complaint. Mr. Dziabis also contends that Mr. Sheets failed to investigate the scheme he was investing in, that he never read the brochures provided to him about the venture, and that he had knowledge in April of 1986 that one of the partners of ITBA had disappeared. Thus, Mr. Dziabis contends that Mr. Sheets either had actual knowledge of the violations or that he had notice of facts at the time the agreement was signed (or at least by May, 1986) to have discovered, in the exercise of due diligence, the alleged violations. Since the original complaint against David Dziabis was not filed until May 11, 1989, he contends the actions are barred by the statute of limitations.

Mr. Sheets contends that all the remaining claims are timely since he actually commenced his suit against David Dziabis on January 9, 1989, less than three years from the date of purchase. The May 11, 1989 date used by Mr. Dziabis is the date Mr. Sheets filed a separate suit against David Dziabis which was consolidated into this case on August 14, 1989. However, Mr. Sheets filed his motion for leave to amend and join an additional party in this case on January 9, 1989. The court granted that motion on May 25, 1989. Mr. Sheets contends that the filing of a motion for leave to amend a complaint to add a defendant, accompanied by the proposed amended complaint, tolls the statute of limitations from the date the motion is filed even if the motion is not granted until after the limitations period expired.

Mr. Sheets' position is well-taken. In *Eaton Corp. v. Alliance Valves Co.*, 634 F.Supp. 974 (N.D.Ind.1984), *aff'd,* 790 F.2d 874 (Fed.Cir.1986), the court concluded that the statute of limitations was tolled when the plaintiff, within the limitations period, filed a proposed amended complaint to add defendants accompanied by a motion to amend, even though the order granting leave to amend and the amended complaint's technical filing occurred after the running of the statute of limitations.

Similarly, Mr. Sheets in this case attached his proposed amended complaint to his motion to amend filed on January 9, 1989. Accordingly, Mr. Sheets is entitled to summary judgment as to David Dziabis' statute of limitations defense to the plaintiff's claims under the Kentucky Securities Act, the Indiana Securities Act, and Section 10(b) of the Securities Act of 1934.

### Conclusion

For the foregoing reasons, the court now:

(1) GRANTS the plaintiff's motion for partial summary judgment on the issue of whether the syndicate interests were securities and the issue of whether the securities were exempt under Indiana law;

(2) DENIES defendant Marvin Dziabis' renewed motion to dismiss;

(3) DENIES defendant David Dziabis' motion for partial summary judgment; and

(4) GRANTS the plaintiff's motion for partial summary judgment as to defendant David Dziabis' statute of limitations defenses as to the plaintiff's claims under the Kentucky Securities Act, the Indiana Securities Act, Section 10(b) of the Securities Act of 1934, and the claim of common law fraud.

SO ORDERED.