**ALEXANDRIA ASSOCIATES, LTD., and Anthony J. LaSala, Plaintiffs,**

v.

**The MITCHELL COMPANY and Mitchell Equities, Defendants.**

**Civ. A. No. J88–0647(B).**

United States District Court,
S.D. Mississippi,
Jackson Division.

July 9, 1992.

---

**13.** *See* Opinion and Award of Arbitrator, p. 19.

E. Clifton Hodge, Jr., Phelps Dunbar Marks Claverie Sims and Jackson H. Ables, III and Jennifer L. Welsh, Daniel Coker Horton and Bell, Jackson, Miss., for plaintiffs.

Ronald G. Peresich * and Lyle M. Page, Page Mannino Peresich, Biloxi, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

BARBOUR, Chief Judge.

This cause is before the Court on Defendants' Motion for Summary Judgment. Plaintiffs have responded to the Motion. The Court, having considered the Motion and response, along with memoranda of authorities and attachments thereto, is of the opinion that Defendants' Motion is well taken and should be granted.

### I. Facts and Procedural History

This action arises out of Plaintiffs' purchase of partnership interests from Defendants. Plaintiff Alexandria Associates, Ltd. ("Alexandria"), a limited partnership, and Plaintiff Anthony J. LaSala ("LaSala"), the individual general partner of Plaintiff Alexandria,[1] contend that their purchase of partnership interests from Defendants violated federal securities laws under the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act"). Plaintiffs also allege numerous

---

* lead counsel

1. The corporate general partner of Plaintiff Alexandria is LaSala Management, Inc., of which Plaintiff LaSala is president and sole shareholder. The developer general partner of Plaintiff Alexandria is Defendant Mitchell Equities. Defendant Mitchell Equities did not share in the profits of Plaintiff Alexandria.

common law claims relating to their purchase of partnership interests.

Defendant Mitchell Company and Defendant Mitchell Equities are general partnerships engaged in real estate development. Defendant Mitchell Equities provides management services related to real estate, in addition to being a general partner in partnerships that own real estate. The stock of the partners of Defendant Mitchell Equities and Defendant Mitchell Company is owned by Altus Real Estate Services, Inc. ("Altus Real Estate"), and its stock, in turn, was owned by Altus Bank. On May 16, 1991, the Resolution Trust Corporation ("RTC") was appointed as receiver for Altus Bank, and the RTC subsequently established Altus Federal Savings Bank ("Altus Federal Savings") as the new entity that acquired certain assets and liabilities of Altus Bank, including Defendant Mitchell Company and Defendant Mitchell Equities.

In the fall of 1985, Defendant Mitchell Company and its affiliate, Southeastern Partners, Ltd. ("Southeastern"), formed two limited partnerships, Timber Ridge Apartments, Ltd. ("Timber Ridge") and Biloxi Associates, Ltd. ("Biloxi Associates"), for the purpose of building, owning and operating apartment complexes through the use of tax-exempt financing insured by the federal Department of Housing and Urban Development ("HUD"). Southeastern was the general partner in both partnerships and owned a one percent interest in each, and Defendant Mitchell Company was the limited partner in both partnerships and owned a 99 percent interest in each. See Affidavit of John B. Saint; Exhibit "A" and Exhibit "C" to Plaintiffs' Response to Defendants' Motion for Summary Judgment. The sole asset of the Timber Ridge partnership was the Timber Ridge apartment complex in Vicksburg, Mississippi, and the sole asset of the Biloxi Associates partnership was the Pass Pointe ("Biloxi") apartment complex in Biloxi, Mississippi. See Exhibit "A" to Defendants' Motion for Summary Judgment. Defendant Mitchell Company also owned AAA

Self Storage Warehouse ("AAA Warehouse") in Biloxi, Mississippi and Beau Terre apartments ("Beau Terre") in Alexandria, Louisiana.

In 1986, Defendant Mitchell Company, through its representative John B. Saint, contacted Plaintiff LaSala in an attempt to facilitate a sale of the Timber Ridge and Biloxi Associates partnership interests, and the AAA Warehouse and Beau Terre apartments. Plaintiff LaSala and Defendant Mitchell Company had previously worked together in commercial real estate transactions. Although the parties disagree as to whether Plaintiff LaSala desired to purchase the properties for subsequent syndication to other investors, or whether Plaintiff LaSala merely intended to assist Defendants with syndication, on October 1, 1986, Plaintiff LaSala and Defendant Mitchell Company executed an Agreement of Sale ("October Agreement") in which Plaintiff LaSala agreed to purchase from Defendant Mitchell Company the Beau Terre apartments and the AAA Warehouse in fee, and the ownership interest in the Timber Ridge apartments and the Biloxi apartments.[2] See Defendants' Exhibit "A." The purchase price, as provided in the October Agreement, was approximately $16.24 million. Id. Plaintiff LaSala paid a $50,000 earnest money deposit to Defendant Mitchell Company as part of the October Agreement. Id.

The parties subsequently amended the October Agreement by executing an Amended and Restated Agreement of Sale on December 9, 1986 ("December Agreement"). See Defendants' Exhibit "B." The December Agreement substituted Plaintiff Alexandria, in which Plaintiff LaSala was a general partner, as the buyer, and retained Defendant Mitchell Company as the seller, along with its affiliates. Id. The December Agreement also lowered the purchase price to $15.685 million. Id. Under the December Agreement, Plaintiff Alexandria purchased the "entire beneficial ownership interest" in the Timber Ridge

---

2. The parties dispute the extent of the ownership interest purchased by Plaintiff in Timber Ridge and Biloxi.

and Biloxi Associates limited partnerships from Defendant Mitchell Company and its affiliates.[3] *Id.* This sale of partnership interests in Timber Ridge and Biloxi Associates forms the basis of Plaintiffs' federal securities law claims, although the parties dispute the meaning of "entire beneficial ownership interest." Plaintiff Alexandria also purchased, in fee, the Beau Terre apartments and the AAA Warehouse. Mortgages and promissory notes were executed in favor of Defendant Mitchell Company.

As a condition precedent to the obligations of Defendant Mitchell Company as seller, the December Agreement provided that Mitchell Homes, an affiliate of Defendant Mitchell Company, would continue as manager of the properties, including the Timber Ridge and Biloxi apartments owned by the Timber Ridge and Biloxi Associates partnerships. *See* Defendants' Exhibit "B." Furthermore, Defendant Mitchell Company agreed to provide marketing services for all the properties pursuant to a Marketing Services Agreement executed on December 1, 1986, and Defendant Mitchell Equities agreed to perform asset management services pursuant to an Asset Management Agreement. *See* Plaintiffs' Exhibit "D" to Exhibit "I;" Plaintiffs' Exhibit "C" to Exhibit "I."

Contemporaneous with the December Agreement, the parties executed an Amendment to Agreement and Certificate of Limited Partnership of Biloxi Associates and an Amendment to Agreement and Certificate of Limited Partnership of Timber Ridge ("Amended Partnership Agreements"), that amended the limited partnership agreements of Timber Ridge and Biloxi Associates. *See* Defendants' Exhibit "E" and Exhibit "P;" Plaintiffs' Exhibit "B" and Exhibit "D." Under the Amended Partnership Agreements, Plaintiff Alexandria became a limited partner with a 99

percent share of profits in both partnerships, and Southeastern remained general partner in both partnerships with a one percent profit share. *Id.* A proposed Second Amendment to the Amended Partnership Agreement for Timber Ridge, dated March 15, 1987, would have substituted Plaintiff LaSala and LaSala Management, Inc. for Southeastern as general partners with a one-half percent interest each, but Southeastern, as withdrawing general partner, did not sign the agreement.

In sum, Plaintiff Alexandria, pursuant to the December Agreement and Amended Partnership Agreements, agreed to become a limited partner with at least a 99 percent ownership interest in both Timber Ridge and Biloxi Associates,[4] and agreed to purchase in fee the Beau Terre apartments and AAA Warehouse.

Plaintiffs then attempted to syndicate partnership interests in Plaintiff Alexandria. *See* Plaintiffs' Exhibit "I;" Defendants' Exhibit "C." In furtherance of the syndication, the Clarion Securities Group Incorporated ("Clarion") prepared a Private Offering Memorandum ("Offering Memorandum") that described the properties owned in fee and the partnership interests held by Plaintiff Alexandria. *Id.* The syndication of Plaintiff Alexandria essentially funded the purchase of Timber Ridge and Biloxi. Moreover, successful syndication of Plaintiff Alexandria was crucial because Plaintiffs needed to raise $400,000 to give to Defendant Mitchell Company for the Timber Ridge and Biloxi partnership interest sale, which was scheduled to close by December 31, 1986. By December 31, 1986, only $160,000 had been raised from investors in Plaintiff Alexandria. Plaintiff LaSala, however, invested a total of $90,000 of his own money in an effort to facilitate closure by the end of 1986, and Defendant Mitchell Company transferred $150,000 to Plaintiff Alexandria to cover a check

---

**3.** The December Agreement also contained a formal assignment clause, which provided in pertinent part as follows:

> 5. *Assignments of Beneficial Interest.* The assignments of Seller's entire beneficial interest in Timber Ridge Apartments, Ltd. and Biloxi Apartments, Ltd., to be delivered by Seller to

Purchaser at the Closing, shall be duly executed and acknowledged by Seller ...
*See* Defendants' Exhibit "B."

**4.** Defendants contend that Plaintiff Alexandria was a general partner with full ownership interest in both partnerships.

written from Plaintiff Alexandria to Defendant Mitchell Company for $400,000. Investment in Plaintiff Alexandria was therefore able to continue during 1987. At some point in 1987, Plaintiff LaSala became concerned about the value of the properties, and demanded a return of the entire $400,000. Plaintiff LaSala and representatives of Defendant Mitchell Company subsequently attempted to restructure or postpone the debt incurred by Plaintiffs.

Throughout this sequence of events, Plaintiffs contend that Defendants and their representatives orally misrepresented the original purchase and value of the Timber Ridge and Biloxi Associates partnership interests, orally misrepresented the nature of Plaintiffs' duties, and orally misrepresented syndication details. These and other alleged oral misrepresentations, as set forth in Plaintiffs' Amended Complaint, form the basis of Plaintiffs' claims. In the end, syndication efforts were unsuccessful. In February 1988, Defendant Mitchell Company filed a foreclosure action in the Chancery Court of Harrison County, Mississippi against Biloxi Associates and a foreclosure action in the Chancery Court of Warren County, Mississippi against Timber Ridge, in which Defendant Mitchell Company sought to foreclose on mortgages executed by both partnerships. *See* Plaintiffs' Exhibit "J" and Exhibit "K."

On December 12, 1988, Plaintiffs filed a Complaint in this Court, alleging federal and state securities law claims and common law claims. Defendants filed a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), which the Court granted on November 30, 1989. Plaintiffs subsequently filed a Motion to Alter Judgment. The Court vacated its earlier order of dismissal, characterized Defendants' Motion to Dismiss as a Motion for Summary Judgment, and denied Defendants' Motion on April 30, 1990.

Plaintiffs filed an Amended Complaint on September 6, 1991, alleging federal and state securities claims as well as numerous common law claims based, as stated above, on Defendants' oral misrepresentations. Defendants have now filed a Motion for Summary Judgment.

## II. Analysis

Rule 56 of the Federal Rules of Civil Procedure states in relevant part that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). The United States Supreme Court has held that this language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Moore v. Mississippi Valley State University,* 871 F.2d 545, 549 (5th Cir. 1989); *Washington v. Armstrong World Industries, Inc.,* 839 F.2d 1121, 1122 (5th Cir.1988).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record in the case which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. However, the movant need not support the motion with materials that negate the opponent's claim. *Id.* As to issues on which the non-moving party has the burden of proof at trial, the moving party need only point to portions of the record that demonstrate an absence of evidence to support the non-moving party's claim. *Id.* at 323–324, 106 S.Ct. at 2553–2554. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553.

Summary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists. The district court, therefore, must

not "resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence." *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980). Summary judgment is improper merely where the court believes it unlikely that the non-moving party will prevail at trial. *National Screen Service Corp. v. Poster Exchange, Inc.,* 305 F.2d 647, 651 (5th Cir.1962).

Defendants' Motion for Summary Judgment presents two issues: (1) whether Defendants' sale of partnership interests in Timber Ridge and Biloxi Associates to Plaintiff Alexandria was an "investment contract," and therefore a security, as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934; and (2) whether Defendants, as subsidiaries of a failed banking institution controlled by the RTC, may invoke the protection of the *D'Oench, Duhme* doctrine to bar Plaintiffs' claims. The Court finds that there are genuine issues of material fact as to whether, under either the limited partnership or general partnership standard, the sale of partnership interests was an "investment contract." The Court further finds, however, that Defendants may invoke the *D'Oench, Duhme* doctrine as a defense to Plaintiffs' claims. Defendants' Motion is therefore well taken and should be granted.

### A. Sale of Partnership Interests as an Investment Contract

The Securities Act of 1933, ("1933 Act"), 15 U.S.C. § 77a, *et seq.,* and the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78a, *et seq.,* do not list "partnership interest" among the items that constitute "securities," but include "investment contract" within the definition of "security." 15 U.S.C. § 77b(1); 15 U.S.C. § 78c(a)(10). The sale of a partnership interest must therefore be an "investment contract" to fall within the scope of the federal securities laws. *See, e.g., L & B Hospital Ventures, Inc. v. Healthcare International, Inc.,* 894 F.2d 150, 151 (5th Cir.1990); *Siebel v. Scott,* 725 F.2d 995, 998 (5th Cir.1984).

■ In *Securities & Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the United States Supreme Court set forth a three-part test for determining whether a contract, transaction or scheme is an investment contract for purposes of the 1933 Act and 1934 Act. The *Howey* test requires: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits to come solely from the efforts of individuals other than the investor or investors. *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104. *Accord, Marine Bank v. Weaver,* 455 U.S. 551, 559, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982); *International Brotherhood of Teamsters, et al. v. Daniel,* 439 U.S. 551, 558, 99 S.Ct. 790, 796, 58 L.Ed.2d 808 (1979); *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975); *Long v. Shultz Cattle Co., Inc.,* 881 F.2d 129, 132 (5th Cir.1989), *reh'g denied,* 896 F.2d 85 (1990); *Youmans v. Simon,* 791 F.2d 341, 345 (5th Cir.1986); *Williamson v. Tucker,* 645 F.2d 404, 417 (5th Cir.1981). The term "solely" in the third prong of the *Howey* test has been modified to account for enterprises in which investors may have minor duties, so that the pertinent inquiry is whether "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Williamson,* 645 F.2d at 418, *quoting SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.1973). *Accord, Youmans,* 791 F.2d at 345; *L & B Hospital,* 894 F.2d at 151–52. For a limited partnership interest to constitute an investment contract within the meaning of the federal securities laws, therefore, there must be an investment of money in a common enterprise, and the significant and essential managerial efforts affecting the failure or success of the enterprise must come from persons or entities other than an investor. *See, e.g., L & B Hospital,* 894 F.2d at 152; *Siebel,* 725 F.2d at 998.

■ General partnership interests, on the other hand, do not usually come within

the definition of "investment contract," because of the significant degree of managerial control exercised by most general partners. *See, e.g., Williamson,* 645 F.2d at 424 (noting that a general partner seeking to invoke the federal securities laws "has a difficult burden to overcome."); *Youmans,* 791 F.2d at 346 (noting that federal securities laws are "usually held not generally to apply to general partners."). However, a general partnership interest may come within the definition of "investment contract" if: (1) "an agreement among the parties leaves so little power in the hands of the partner or venturer that the agreement in fact distributes power as would a limited partnership;" (2) "the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising partnership or venture powers;" or (3) "the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers." *Williamson,* 645 F.2d at 424. *Accord, Youmans,* 791 F.2d at 346. "Economic reality," rather than form, determines whether a particular arrangement or investment scheme is an "investment contract," because the formal or theoretical duties of an investor may not accurately portray the distribution of power between the parties. *See International Brotherhood of Teamsters,* 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979); *Williamson,* 645 F.2d at 418; *Long,* 881 F.2d at 133.

The Court further notes, as a preliminary matter, that genuine issues of material fact may preclude the entry of summary judgment on the question of whether the sale of a partnership interest constitutes an "investment contract" within the meaning of the federal securities laws. *See, e.g., L & B Hospital,* 894 F.2d at 153; *Newmyer v. Philatelic Leasing, Ltd.,* 888 F.2d 385, 395 (6th Cir.1989); *Hocking v. Dubois,* 885 F.2d 1449 (9th Cir.1989); *Stewart v. Germany,* 631 F.Supp. 236, 240 (S.D.Miss.1986); *Dept. of Economic Development v. Arthur Andersen & Co.,* 683 F.Supp. 1463, 1474

(S.D.N.Y.1988). *See also United States v. Carman,* 577 F.2d 556, 562 n. 7 (9th Cir. 1978) (question of law whether a particular investment scheme is an "investment contract" within the federal securities laws, but a "properly instructed" jury can make the determination); *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1255 (9th Cir.1976) (whether an "investment" has been made in return for a "security" is ultimately a question of law, but in "appropriate circumstances" a "properly instructed" jury can determine whether an instrument is or is not a security); *Ahern v. Gaussoin,* 611 F.Supp. 1465, 1477 (D.C.Or. 1985) (whether an instrument is a security is "ultimately a question of law," but issue may be submitted to jury "where there are disputed facts"). *But see Ahrens v. American-Canadian Beaver Co.,* 428 F.2d 926, 928 (10th Cir.1970) (whether contract is an "investment contract" is a question of law); *Sheets v. Dziabis,* 738 F.Supp. 307, 308 n. 1 (N.D.Ind.1990) (whether an "arrangement" is an "investment contract" is a question of law).

■ In the present action, the Court must determine whether the Timber Ridge and Biloxi Associates partnership interests purchased by Plaintiff Alexandria were "investment contracts" and therefore "securities" within the meaning of the 1933 Act and 1934 Act. Although the question is close, the Court finds that genuine issues of material fact preclude the entry of summary judgment as to whether the sale of partnership interests to Plaintiff Alexandria constituted an "investment contract."

Defendants contend that the Court should apply the general partnership standard to determine whether the partnership interests were securities. Defendants rely on the Offering Memorandum, on a purported assignment of partnership interest and on the December Agreement in support of their contention. The Offering Memorandum, distributed to potential investors in Plaintiff Alexandria, represented that Plaintiff Alexandria would "acquire and operate" the Beau Terre, Timber Ridge and Biloxi apartments and AAA Warehouse, by obtaining title to the properties

"or by acquiring a 100% interest in the partnership which owns the property." Defendants' Exhibit "C" at 6. Defendants contend that Plaintiff Alexandria, by acquiring a "100% interest" in Timber Ridge and Biloxi Associates as represented in the Offering Memorandum, was a general partner of both partnerships. The Court finds, however, that the Offering Memorandum does not, by itself, accurately reflect the relationship between the parties. Clarion prepared the Offering Memorandum for potential investors in Plaintiff Alexandria. The Offering Memorandum, therefore, was merely an enticement to third-party investors and was not a legally binding representation of the relationship between Plaintiffs and Defendants vis-a-vis Timber Ridge and Biloxi Associates. As such, the Offering Memorandum may be instructive as to the intentions of the parties or the nature of their relationship, in the absence of an unambiguous contract, but the Offering Memorandum does not by itself determine that Plaintiffs were general partners in Timber Ridge and Biloxi Associates.

Defendants also rely on a purported assignment, by letter dated December 9, 1986, of the general partnership interest of Southeastern in Timber Ridge and Biloxi Associates. *See* Exhibit "2" to Defendants' Exhibit "F." The purported assignment provided in pertinent part as follows:

> Southeastern agrees to assign as of the date hereof its entire general partnership interests in Timber Ridge and Biloxi in each case equally to Anthony J. LaSala and LaSala Management, Inc.
>
> The sole condition subsequent to the assignments of the general partner interests of Timber Ridge shall be the disbursement of that certain first mortgage loan ... Further, Southeastern agrees, within the body of said assignment, to obligate itself to take such actions as may be required to cause such disbursement to be completed by February 28, 1987 ...

*Id.* The letter also provided similar language purporting to assign the general partnership interest in Biloxi Associates, with the loan disbursement to be completed by December 31, 1987. *Id.* Plaintiffs contend that the language "within the body of said assignment" contemplates a future assignment, and contend that the letter was, in effect, an agreement to agree. Plaintiffs' argument is well taken. The language "within the body of said assignment" clearly contemplates another document, particularly in light of the conditions subsequent enumerated in the letter, and in light of the Second Amendment to the Amended Partnership Agreement for Timber Ridge. The Second Amendment to the Amended Partnership Agreement, dated March 15, 1987, attempted to institute Plaintiff LaSala and LaSala Management as general partners of Timber Ridge in place of Southeastern, which was referred to as the "Withdrawing General Partner." *See* Exhibit "6" and Exhibit "7" to Deposition of Anthony LaSala. Southeastern did not sign this document. *Id.* The Court concludes that the Second Amendment demonstrates that an assignment of general partnership interest had not previously been effectuated because the Second Amendment still listed Southeastern as general partner. Moreover, the Second Amendment did not become effective because Southeastern never executed the document. The Court also notes that Defendants served Southeastern, as general partner, with process in the state foreclosure actions against Plaintiffs. *See* Plaintiffs' Exhibit "J" and Exhibit "K." Accordingly, the Court cannot conclude, at this juncture, that Plaintiffs were the general partners of Timber Ridge and Biloxi Associates.

The Court therefore evaluates Plaintiffs' partnership interests under the limited partnership standard, and concludes that there are genuine issues of material fact as to whether the partnership interests meet the definition of "investment contract." In particular, the Court finds that there are issues of fact with respect to whether Defendants exercised the essential and significant activities critical to the success of the enterprise.

The sale of interests which Plaintiffs allege to be "investment contracts" within the meaning of the federal securities laws was Plaintiffs' purchase of partnership in-

terests in Timber Ridge and Biloxi. After Plaintiff Alexandria purchased the partnership interests in Timber Ridge and Biloxi, shares in Plaintiff Alexandria were offered to investors. The "expectation of profits from the transaction," therefore, under the third part of the *Howey* test as modified by *Williamson,* may have depended in part on Plaintiffs' ability to market shares in Plaintiff Alexandria. Clearly, Defendants have produced evidence from which it can be inferred that Plaintiffs exercised, or had the potential to exercise, a significant quantum of control over the Alexandria syndication. The Offering Memorandum, for example, stated that Plaintiff LaSala would make "all decisions with respect to the management of the [Alexandria] partnership," and stated that Capital Realty, Inc., an affiliate of Plaintiff LaSala, would supervise Defendant Mitchell Company as Managing Agent. *See* Defendants' Exhibit "C."

However, the underlying value of shares in Plaintiff Alexandria was determined by the value of the Timber Ridge and Biloxi apartment complexes, which were managed and marketed by Defendants. The Asset Management Services Agreement and the Marketing Services Agreement obligated Defendant Mitchell Equities and Defendant Mitchell Company to perform significant duties for Plaintiff Alexandria regarding the Timber Ridge and Biloxi properties. *See* Exhibit "C" and Exhibit "D" to Plaintiffs' Exhibit "I." These agreements demonstrate that profits from Plaintiffs' purchase of Timber Ridge and Biloxi partnership interests would be largely derived from Defendants' efforts. A finder of fact could reasonably conclude that Plaintiffs' potential profit, as investors in Timber Ridge and Biloxi Associates, depended on the ability of Defendants to successfully manage and market the Timber Ridge and Biloxi properties, wholly apart from the syndication of Plaintiff Alexandria. The Court finds, therefore, that genuine issues of material fact exist as to whether Plaintiffs' purchase of partnership interests constituted an "investment contract" within the meaning of the federal securities laws.

## B. D'Oench, Duhme Doctrine and Subsidiaries of Failed Banking Institutions

Defendants contend that the *D'Oench, Duhme* doctrine bars Plaintiffs' claims because all such claims are based on unrecorded oral side agreements involving Defendants, who are wholly-owned subsidiaries of a failed banking institution currently under the control of the RTC.

In *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corporation,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court held that the maker of a note could not assert an unwritten oral agreement with a failed bank, taken over by the Federal Deposit Insurance Corporation ("FDIC"), as a defense to an action to enforce the note brought by the FDIC. The maker of the note could not argue that the failed bank had orally agreed to not enforce the note, and the maker was obligated to perform its obligations to the FDIC.

There is a common law *D'Oench, Duhme* doctrine and a statutory *D'Oench, Duhme* doctrine, 12 U.S.C. § 1823(e), but both doctrines are essentially the same. *See Texas Refrigeration Supply, Inc. v. Federal Deposit Insurance Corporation,* 953 F.2d 975, 979 n. 3 (5th Cir.1992); *Kilpatrick v. Riddle,* 907 F.2d 1523, 1526 n. 4 (5th Cir. 1990). The statutory *D'Oench, Duhme* doctrine, 12 U.S.C. § 1823(e), provides as follows:

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or

its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e). Under the *D'Oench, Duhme* doctrine, secret, unwritten agreements with failed banks are unenforceable against federal receivers unless the four statutory non-secrecy requirements are met.

There are two rationales for the *D'Oench, Duhme* doctrine. First, bank regulators must be able to rely on written records to determine the fiscal status of a bank. *Langley v. Federal Deposit Insurance Corporation*, 484 U.S. 86, 91–92, 108 S.Ct. 396, 399–400, 98 L.Ed.2d 340 (1987). Misleading or deceptive secret agreements undermine the ability of regulators to "accurately assess the condition of a bank based on its books." *Bowen v. Federal Deposit Insurance Corporation*, 915 F.2d 1013, 1016 (5th Cir.1990). Second, the *D'Oench, Duhme* doctrine "ensure[s] mature consideration of unusual loan transactions ... and prevents fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." *Langley*, 484 U.S. at 91–92, 108 S.Ct. at 399. Although the *D'Oench, Duhme* case involved the FDIC, the *D'Oench, Duhme* doctrine has subsequently been expanded to protect the Federal Savings & Loan Insurance Corporation ("FSLIC"), *see Federal Savings & Loan Insurance Corporation v. Murray*, 853 F.2d 1251 (5th Cir.1988), and the RTC, *see Oliver v. Resolution Trust Corp.*, 955 F.2d 583 (8th Cir.1992), against secret agreements.

Defendants in the present action argue for the application of the *D'Oench, Duhme* doctrine as third-generation subsidiaries of a failed banking institution. Altus Real Estate owned the stock of all the partners of Defendant Mitchell Company and Defendant Mitchell Equities, both of which are general partnerships. Altus Bank owned the stock of Altus Real Estate. On May 16, 1991, Altus Bank went into receivership and the RTC was appointed as its receiver. The RTC established and became the conservator of Altus Federal Savings, the new financial entity that acquired certain assets and liabilities of Altus Bank, including Defendant Mitchell Company, Defendant Mitchell Equities, and Altus Real Estate. Defendants therefore argue that all of Plaintiffs' claims arising out of alleged unwritten oral agreements between Defendants and Plaintiffs are barred by the *D'Oench, Duhme* doctrine, because Defendants are subsidiaries of a failed banking institution that, in a different form, is presently under the conservatorship of RTC.

■ Plaintiffs argue against the application of the *D'Oench, Duhme* doctrine on several grounds. First, Plaintiffs contend that the *D'Oench, Duhme* doctrine does not apply to federal securities claims. In *Kilpatrick v. Riddle*, 907 F.2d 1523 (5th Cir.1990), however, the United States Court of Appeals for the Fifth Circuit held that the *D'Oench, Duhme* doctrine barred federal securities law claims brought by allegedly defrauded borrowers against a failed bank that had been taken over by the FDIC. In responding to the plaintiffs' argument that application of the *D'Oench, Duhme* doctrine would deprive defrauded borrowers of the protection otherwise afforded by the federal securities laws, the Fifth Circuit expressly stated as follows:

> We find the fact that the 'agreement' in this case allegedly involved securities fraud is unimportant for purposes of *D'Oench, Duhme* analysis. It is not the nature or enforceability of an agreement between a bank and borrower that controls the application of the *D'Oench, Duhme* doctrine; if the agreement is unwritten, *D'Oench, Duhme* applies ...

> We must therefore conclude that claims under the federal securities laws provide no basis from which to carve an exception from the *D'Oench, Duhme* doctrine.

*Kilpatrick*, 907 F.2d at 1529. *See also Federal Deposit Insurance Corporation v. Investors Associates X., Ltd.*, 775 F.2d 152 (6th Cir.1985). It is therefore clear, despite Plaintiffs' protestations to the con-

trary, that the *D'Oench, Duhme* doctrine can bar federal securities claims.

■ Plaintiffs also make two related contentions regarding the entities to which the *D'Oench, Duhme* doctrine applies. First, Plaintiffs contend that only banking regulators, and not subsidiaries of failed banking institutions, can invoke the protection of *D'Oench, Duhme*. In addition, Plaintiffs contend that the party seeking to apply *D'Oench, Duhme* must have relied on a scheme or arrangement likely to mislead or directly involving a bank.

Plaintiffs' contentions present difficult issues that the Court of Appeals for the Fifth Circuit has not yet resolved. *See Garrett v. Commonwealth Mortgage Corp. of America*, 938 F.2d 591, 595 (5th Cir.1991) (court declined to consider the application of *D'Oench, Duhme* to subsidiaries of failed banking institutions). Plaintiffs argue that the *D'Oench, Duhme* doctrine was not meant to apply to third generation non-banking subsidiaries of a failed banking institution that has been taken over by the RTC. The Court notes that written agreements entered into by such subsidiaries would seldom appear in the records of the failed parent bank or be subject to approval by the board of the failed parent bank. Accordingly, common sense might dictate that the *D'Oench, Duhme* doctrine should be limited to federal regulatory agencies that operate failed banks, and limited to agreements to which failed banks were signatories. The Court, however, is more inclined to agree with Defendants. Courts, including the Fifth Circuit, have generally been unwilling to limit the scope of the *D'Oench, Duhme* doctrine or otherwise frustrate the policies behind the doctrine in any respect. *See, e.g., Kilpatrick*, 907 F.2d at 1529. A distinction between a parent bank and its non-banking subsidiaries would do both. As assets of a failed bank, non-banking subsidiaries enter into agreements to which the parent bank is indirectly a party. The financial interests of a failed parent bank are therefore affected, albeit tangentially, by the actions of its non-financial subsidiaries. For this reason, as further explained below, the Court declines to limit the reach of the *D'Oench, Duhme* doctrine.

The sweep of the *D'Oench, Duhme* doctrine extends beyond the FDIC, the RTC and the FSLIC, assignees of the FDIC, *Bell & Murphy & Assoc., Inc. v. Interfirst Bank Gateway, N.A.*, 894 F.2d 750, 754–55 (5th Cir.1990), and successors in interest of the FSLIC, *Porras v. Petroplex Sav. Ass'n.*, 903 F.2d 379 (5th Cir.1990). Although, as stated earlier, the Fifth Circuit has not yet applied the doctrine to subsidiaries, *see Garrett*, 938 F.2d at 595, the Court finds persuasive the reasoning of the Eleventh Circuit and Eighth Circuit on the issue. In *Victor Hotel Corp. v. FCA Mortgage Corp.*, 928 F.2d 1077, 1083 (11th Cir. 1991), the Eleventh Circuit held that a subsidiary of a federally insured failed banking institution could invoke the *D'Oench, Duhme* doctrine as a bar to breach of contract and fraudulent inducement claims brought by allegedly defrauded mortgagors. The court stated that "the actual parties to the loan agreement is irrelevant in determining the applicability of *D'Oench* ... [because] FCA [the subsidiary] came within the scope of *D'Oench* once FSLIC became receiver of Old American [the failed institution] and acquired all of Old American's assets." *Victor Hotel*, 928 F.2d at 1083. The subsidiary could invoke the protection of *D'Oench, Duhme* because it was controlled, through acquisition of the failed parent bank, by the FSLIC. In addition, as the court noted, excluding subsidiaries from the scope of *D'Oench, Duhme* would frustrate the policy of easing the burden on federal regulatory agencies. *D'Oench, Duhme* permits federal regulators investigating failed financial institutions to rely solely on written records. It is therefore contrary to the policy considerations behind *D'Oench, Duhme* to disallow unwritten agreements directly involving a failed bank, while requiring federal regulators to consider unwritten agreements entered into by subsidiaries, which are assets of the failed bank. A subsidiary, in other words, is no different from any other asset for the purpose of determining the fiscal status of a failed institution. As the Eleventh Circuit noted,

[t]he FSLIC has to rely on a financial institution's written records and its assets, such as wholly-owned subsidiaries, to determine solvency for regulatory purposes ... *D'Oench* and section 1823 prevent secret agreements between a subsidiary of a failed institution and a borrower from interfering with FSLIC's regulating duties.

*Victor Hotel,* 928 F.2d at 1083.

The Eighth Circuit has similarly held that subsidiaries of failed banking institutions may invoke the *D'Oench, Duhme* doctrine. *Oliver v. Resolution Trust Corp.,* 955 F.2d 583 (8th Cir.1992). The court cited *Victor Hotel* with approval and stated that a wholly-owned subsidiary could invoke *D'Oench, Duhme* because the doctrine

> extends broadly to cover any secret agreement adversely affecting the value of a financial interest that has come within the RTC's control as receiver of a failed financial institution.

*Oliver,* 955 F.2d at 585. Subsidiaries are not precluded, on the basis of their status as subsidiaries, from asserting *D'Oench, Duhme* as a defense to claims based on oral side agreements.

▮ Accordingly, Plaintiffs' related contention that a bank must be directly involved in an unwritten agreement for *D'Oench, Duhme* to apply fails as well. As *Victor Hotel* and *Oliver* make clear, unwritten agreements of a subsidiary, for purposes of *D'Oench, Duhme,* are unwritten agreements of a failed banking institution. If a failed bank itself was a party to an unwritten agreement, or was indirectly a party to an unwritten agreement entered into by an asset, such as a subsidiary, *D'Oench, Duhme* applies. *See Porras,* 903 F.2d at 381 (private parties that purchase the assets of failed banks are entitled to *D'Oench, Duhme* protection); *Federal Deposit Ins. Corp. v. Hoover–Morris Enterprises,* 642 F.2d 785, 787 (5th Cir.1981) (the FDIC is entitled to *D'Oench, Duhme* pro-

tection against claims arising out of an unwritten agreement involving an asset purchased from a failed bank, even though the failed bank was not a party to the unwritten agreement). A bank therefore need not be directly involved in an unwritten agreement, as in the present action, for a party to invoke *D'Oench, Duhme.*[5] As the Supreme Court stated in the *D'Oench, Duhme* decision, the basic principle behind the doctrine is the protection of a federal regulatory authority and "the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [it] insures or to which it makes loans." *D'Oench, Duhme,* 315 U.S. 447, 457, 62 S.Ct. 676, 679. Unwritten agreements entered into by an asset of a failed bank, such as a subsidiary, are disallowed under *D'Oench, Duhme. See Astrup v. Midwest Federal Savings Bank,* 886 F.2d 1057 (8th Cir.1989) (wholly-owned real estate developer subsidiary of failed savings and loan could assert *D'Oench, Duhme* doctrine to preclude breach of contract claims brought by co-venturer).

In the present action, Plaintiffs have challenged the application of the *D'Oench, Duhme* doctrine on the grounds addressed above by the Court. Plaintiffs do not contend in their response to Defendants' Motion for Summary Judgment that their claims are not based on unwritten agreements and it is clear to the Court that Plaintiffs' claims are, in fact, based on Defendants' unwritten agreements and representations. *See* Plaintiffs' Amended Complaint, Paragraph 19. Plaintiffs allege that they entered into the purchase of partnership interests from Defendants on the basis of oral, unwritten promises made by John B. Saint on behalf of Defendants. These extra-contractual agreements, which were not reflected in the formal documents executed by the parties, allegedly misrepresented the nature and profitability of the part-

---

**5.** The Court notes that an intent to deceive federal regulatory authorities is not relevant to the application of *D'Oench, Duhme. See, e.g., Texas Refrigeration Supply,* 953 F.2d at 980 n. 7 (irrelevant whether agreement was "illegal or made with some intent to deceive the banking authorities"); *Investors Associates X.,* 775 F.2d at 154 (fraudulent intent is irrelevant to application of *D'Oench, Duhme*).

nership interests and, accordingly, form the basis of Plaintiffs' claims. The Court therefore finds that because Plaintiffs' claims are based on unwritten agreements, a fact that Plaintiffs do not dispute, such claims are barred by the *D'Oench, Duhme* doctrine.

For the foregoing reasons, the Court finds that Defendants' Motion for Summary Judgment is well taken and should be granted.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment should be and hereby is granted. A separate judgment will be entered in accordance with this Memorandum Opinion and Order.

SO ORDERED.